Thomas J. McDONNELL,
Plaintiff–Appellee,

v.

Michael COURNIA, Richard Menzel, Gary Moe, Thomas Christopher, Defendants–Appellants.

No. 92–2907.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1993.

Decided April 7, 1993.

---

David E. Lasker, Julian, Olson & Lasker, Madison, WI (argued), for plaintiff-appellee.

Scott G. Thomas, Rudolph M. Konrad, Office of the City Atty., Milwaukee, WI (argued), for defendants-appellants.

Before BAUER, Chief Judge, FLAUM, and MANION, Circuit Judges.

BAUER, Chief Judge.

In this case, we consider an interlocutory appeal from the district court's order denying summary judgment on a claim of qualified immunity. We have jurisdiction to hear this claim under *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). We reverse.

## I. Facts

Because the facts surrounding Thomas McDonnell's arrest lie at the heart of this appeal, we review them in some detail. McDonnell visited Pulaski Park in Milwaukee, Wisconsin on April 12, 1985. He entered a park pavilion to use the rest room, and met a twelve year old girl, Cathleen Yauch. He spoke with Yauch, and touched

her right arm. After the brief meeting, McDonnell used the rest room and went to his car. He stopped for a few minutes to read a newspaper. While he was reading, Yauch and another girl began yelling at him. McDonnell left the park.

Gerald Pfannerstill, a park employee, overheard two girls talking about a man who tried to rape one of them. Pfannerstill spoke with the girls and then reported to his supervisor. The supervisor called the police. Yauch told the park employee and Milwaukee police officer Michael Cournia and Pfannerstill that a man grabbed her, tried to reach between her legs, and attempted to drag her into the mens' rest room. Yauch described the man she said attacked her to Officer Cournia and to Officer Richard Menzel. Cournia took Yauch home, and Menzel began searching for the assailant. Detectives Gary Moe and Thomas Christopher visited Yauch's home later that day and interviewed her. Yauch repeated her story to the officers. The officers interviewed Yauch's friends who confirmed her account.

On April 15, 1985, Pfannerstill called the police and reported that a man matching the description Yauch provided was visiting the park. Menzel went to the park and arrested the man. That man was McDonnell. Cournia also went to the park on April 15 and interviewed Pfannerstill. Pfannerstill told Cournia that he had seen McDonnell in the park on April 12, 1985. McDonnell was placed in a police lineup with four other men. Yauch identified him as her assailant.

McDonnell was charged with first degree sexual assault and attempted abduction, with an enhancement for habitual criminality. McDonnell had been convicted of second degree sexual assault of a twelve year old boy in 1982. The police officer defendants in this case each testified that they did not learn McDonnell's identity, or of his prior record until he was arrested April 15. At a preliminary hearing held on April 24,

1985, Yauch testified that McDonnell attacked her in the pavilion at Pulaski Park. She told the judge substantially the same story she told the police on April 12. She also testified that she told Pfannerstill about the incident before the police arrived.

McDonnell entered an *Alford* guilty plea[1] in exchange for the state's agreement to drop the abduction count and the habitual criminality enhancement. He was sentenced to eleven years imprisonment on February 17, 1986. In January 1989, McDonnell filed a motion to set aside his conviction based upon Yauch's recantation of her story. In a written statement, Yauch asserted that she lied to police and at McDonnell's preliminary hearing. She stated that McDonnell never grabbed or pulled her, never threatened her verbally, and never attempted to hurt her in any way. Affidavit of November 10, 1988, Exhibit J to Affidavit of Attorney Scott G. Thomas in Support of Motion for Summary Judgment, Record Document ("R.Doc.") 16 ("Yauch Affidavit"). Yauch affirmed McDonnell's version of their brief encounter in the Pulaski Park Pavilion.

In her affidavit, Yauch asserted:

> My false story was the result of being requested to do something by the man who first contacted me at the park after Mr. McDonnell left. It further was the result of great pressure by the police to give them a story about what happened that would help to "put him away" so that "he won't see the light of day."

*Id.* After the affidavit and an accompanying motion to set aside the conviction were filed, Milwaukee County Circuit Judge John McCormick held a hearing on April 27, 1989. At that hearing Yauch testified reaffirming her affidavit. McDonnell's attorney questioned Yauch about her statements to Detectives Moe and Christopher:

> Q. And you told the detectives that the man in fact reached down and tried to

---

1. In *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970), the Supreme Court ruled that a judge may accept a guilty plea from a criminal defendant who maintains his innocence but concludes that a guilty plea is in his best interests. In *Alford*, as in McDonnell's case, the defendant pled guilty to limit the possible penalty. *Id.* at 31, 91 S.Ct. at 164.

touch your vaginal area, but you were able to slap his hand away; right?

A. Yes.

\* \* \* \* \* \*

Q. And you also told those detectives that he tried to drag you into the bathroom; right?

A. Yes.

\* \* \* \* \* \*

Q. And you also went outside and told your friend that a man had tried to rape you; right?

A. Yes.

Q. Now apparently this came to the attention of someone who worked at the park who overheard you say that; right?

A. Yes.

Q. And then the police were called. Now when you—after you were interviewed by the uniformed officers who came on the scene and the detectives from the Sexual Assault Unit who came to interview you at your house, there came a time that within a day or two you were asked to come down to the—a few days later you came down to the District Attorney's Office; right?

A. Yes.

\* \* \* \* \* \*

Q. And then you were subpoenaed to come to court and testify at the preliminary hearing, the transcript of which you just referred to, on April 24, 1985; right?

A. Yes.

\* \* \* \* \* \*

Q. You never told any of us that you made things up; right?

A. Right.

Q. And you never told anybody that the police had told you that you should help "put him away so that he won't see the light of day"; you never said that did you? You never told us that, did you, that the police had said that to you, did you?

A. No.

Transcript of Hearing to Set Aside Conviction, April 27, 1989 ("Tr. of 4/27/89") at 22–23. The state's attorney probed further:

Q. Now when the uniformed officers came to the park and talked to you and you told him what you just finished telling us, that is that the man had grabbed you and tried to touch your vaginal area and dragged you off but you were able to break away and run outside, is it your testimony that that's the officer who you now claim said that he wanted your help to "put him away so that he won't see the light of day"? Is that who you say it was made that statement to you?

A. I really don't remember.

Q. And then when the detectives came to your house, did they also say this? As far as you can remember?

A. I don't think so.

Q. Well, if they didn't say it, are you saying it was the uniformed officers who said it or was it the detectives?

A. It was the people that came to the pavilion.

Q. Do you remember whether the uniformed officers said it to you?

A. I don't remember.

\* \* \* \* \* \*

Q. Cathy, let me ask you this, you say you're not sure, you don't remember which of these officers said it, am I correct in my understanding though that at least one of the police officers, you do remember one of the police officers telling you that as you testified to?

A. Yes.

Tr. of 4/27/89 at 27–29. Yauch also testified that at least one of the police officers told her that the man who attacked her "was wanted all over for rape." *Id.* at 31.

Statements from two of Yauch's friends were also considered in the state proceeding to set aside McDonnell's conviction. Lynn Ann Jones stated that Yauch was not upset when she left the pavilion. Jones also admitted that Yauch persuaded her to tell police that she saw McDonnell try to touch Yauch between the legs, even though

she had not actually seen anything. Affidavits of Lynn Ann Jones, quoted in *State of Wisconsin v. McDonnell*, No. L–1669 slip op. at 4–5 (Circuit Court of Milwaukee, Wisconsin July 10, 1989). Wanda Smokovitz, another friend of Yauch's, said that Yauch returned from the pavilion and told them that a man had tried to rape her, but that Yauch "seemed to be play acting and wasn't upset or disturbed." *Id.* at 4 (quoting Affidavit of Wanda Smokovitz at 2).

The state court found Yauch's recantation credible, and vacated McDonnell's conviction. He was released on July 10, 1989, and the criminal case was dismissed on motion from the state. McDonnell sued officers Cournia, Menzel, Moe, and Christopher, as well as park employee Pfannerstill under 42 U.S.C. § 1983. He alleges that the defendants conspired to have Yauch make false charges against him in violation of his Fourteenth Amendment rights to due process and to freedom from unreasonable searches and seizures.

The police officer defendants moved for summary judgment, contending they are entitled to qualified immunity for their actions during and after McDonnell's arrest. Pfannerstill also moved for summary judgment. The court denied both motions. It held: "It is clear to the court that Cathleen Yauch's recantation raises genuine issues of material fact as to the defenses which can only be resolved by the trier of fact assessing the credibility of the various parties." *McDonnell v. Cournia*, No. 91 C 352, slip op. at 4 (E.D.Wisc. July 31, 1992). The police officers have appealed.

## II. Analysis

■ *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985), allows defendants to bring interlocutory appeals under 28 U.S.C. § 1291 to renew their arguments that they are entitled to qualified immunity. *See Marshall v. Allen*, 984 F.2d 787 (7th Cir.1993); *Gorman v. Robinson*, 977 F.2d 350, 352 (7th Cir.1992). When a party appeals a denial of summary judgment on qualified immunity grounds, we evaluate the record *de novo* to determine whether we can decide the immunity questions without resolving disputed questions of fact. *Hansen v. Bennett*, 948 F.2d 397, 398 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992). If we find we cannot, then we lack jurisdiction over the appeal of the immunity questions. *See Gorman v. Robinson*, 977 F.2d 350, 354 (7th Cir.1992); *Hansen*, 948 F.2d at 398; *Elliott v. Thomas*, 937 F.2d 338, 342–43 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1242, 117 L.Ed.2d 475 (1992); *Hannon v. Turnage*, 892 F.2d 653, 654 (7th Cir.), *cert. denied sub nom., Hannon v. Derwinski*, 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). If we can decide the question as a matter of law, then we have jurisdiction over that question. *Gorman*, 977 F.2d at 354, and we review the district court's summary judgment determination *de novo*. *Marshall v. Allen*, 984 F.2d at 793.

■ In conducting this review, we consider the evidence in the light most favorable to the non-moving party, McDonnell. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(c) "by its very terms, . . . provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). A non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *Id.* at 249, 106 S.Ct. at 2510. Moreover, if the factual context renders the claims asserted by the party opposing summary judgment implausible, the party must "come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

Our review in this case is complicated by the fractured record. Neither party has provided complete copies of the transcripts of the hearings held by the state court before McDonnell was released. These transcripts are the primary source of evidence about the circumstances surrounding the arrest. Of course our review is restricted to the contents of the record the parties have provided.

■ The defendant police officers contend that qualified immunity shields them from liability for their actions incident to and including McDonnell's arrest because they reasonably believed the arrest was supported by probable cause. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To determine whether an official's conduct violates clearly established law requires a two-step inquiry. First, the plaintiff must show that the law was clearly established when the challenged conduct occurred. In this Circuit, we ask "whether the law was clear in relation to the specific facts confronting the public official when he or she acted." *Apostol v. Landau*, 957 F.2d 339, 341 (7th Cir.1992). Second, we evaluate the objective legal reasonableness of the defendants' conduct. We inquire whether reasonably competent officials would agree on the application of the clearly established right to a given set of facts. *Id.* at 341. *See also Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1578, 118 L.Ed.2d 220 (1992).

■ The defendants do not dispute that McDonnell had a clearly established right in 1985 to be free from arrest without probable cause. This appeal focuses upon the second prong of the analysis. We examine the undisputed facts in the record to evaluate the objective legal reasonableness of the officers' acts. *Apostol*, 957 F.2d at 342. In this case, then, qualified immunity shields the defendant police officers from McDonnell's damage action if "a reasonable officer could have believed [McDonnell's arrest] to be lawful, in light of clearly established law and the information the arresting officers possessed." *Hunter v. Bryant*, —— U.S. ——, ——, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). As the Eighth Circuit has explained, "[i]f a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is *any* reasonable basis to conclude that probable cause existed." *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir.1992) (citing *Hunter*, —— U.S. at ——, 112 S.Ct. at 536). *Hunter v. Bryant* controls our analysis here.

James Bryant was arrested by two Secret Service agents for making threats against the President of the United States. *Id.* at ——, 112 S.Ct. at 535. Bryant delivered two copies of a handwritten letter to offices at the University of Southern California. The letter indicated that a person called "Mr. Image" was plotting to assassinate President Ronald Reagan. The letter said that many United States officials were conspiring with Mr. Image to assassinate the President during his upcoming trip to Germany. Campus police called the Secret Service, and an agent interviewed University employees. The employees identified Bryant and repeated some of his comments. One employee said Bryant "told her he [Reagan] should have been assassinated in Bonn;" another said Bryant talked about "bloody coups" and "assassination" and "said something about 'across the throat' while moving his hand horizontally across his throat to simulate a cutting action." *Hunter*, —— U.S. at ——, 112 S.Ct. at 535.

Two agents visited the address that appeared on the letter. Bryant answered the door and allowed the agents to come inside. He admitted that he wrote and delivered the letter, but refused to identify Mr. Image. The agents searched the apartment and found the original letter. Bryant refused to answer questions about how he felt about the President, or whether he

intended to harm the President. *Id.* at ——, 112 S.Ct. at 535. The agents arrested Bryant, but the charges were eventually dismissed on a government motion.

The Ninth Circuit ruled that the agents were not entitled to qualified immunity on the claim that they had arrested Bryant without probable cause. The court concluded that the agents "had failed to sustain the burden of establishing qualified immunity because their reason for arresting Bryant—their belief that the 'Mr. Image' plotting to kill the President in Bryant's letter could be a pseudonym for Bryant—was not the most reasonable reading of Bryant's letter." *Id.* at ——, 112 S.Ct. at 535. The Supreme Court found that the Ninth Circuit had "ignore[d]" the governing law. *Id.*

> The Court of Appeals' confusion is evident from its statement that 'whether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach.' This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

*Id.* at ——, 112 S.Ct. at 537. The Court ruled that the agents were entitled to qualified immunity. *Id.* "Probable cause existed if at the moment the arrest was made the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that Bryant had violated [the law]." *Id.* (citations omitted). The Court found that probable cause existed because the agents had information that Bryant wrote the letter and knew the President's whereabouts, and because Bryant refused to answer questions. The Court also explained that

even if they "erred in concluding that probable cause existed to arrest Bryant the agents nevertheless would be entitled to qualified immunity because their decision was reasonable, even if mistaken." *Id.* The Court stressed that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law.... This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Id.* (citations omitted).

■ At issue here, then, is whether a reasonable police officer could have believed he had probable cause to arrest McDonnell. McDonnell contends that we cannot make this determination because "Cathleen Yauch's recent statements place in dispute the police defendants' account of how they came to arrest Mr. McDonnell." Appellee's Brief at 4. McDonnell's characterization of Yauch's statements, however, is not entirely correct. Her statements do not contradict every element of the officers' accounts, as McDonnell contends. Our review of McDonnell's arguments are strictly limited to the record before us. Self-serving assertions without factual support in the record will not defeat a motion for summary judgment. *See Kornacki v. Norton Performance Plastics*, 956 F.2d 129 (7th Cir.1992). Our analysis of qualified immunity is objective, not subjective. *Apostol*, 957 F.2d at 342. The question is not what motivated the police officers when they arrested McDonnell. Rather it is whether reasonable officers in their positions would have known they were violating McDonnell's clearly established rights when they arrested him. *Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). McDonnell's argument repeats the Ninth Circuit's mistake in *Hunter v. Bryant. See* —— U.S. at ——-——, 112 S.Ct. at 536–37. McDonnell argues:

> The only question remaining is whether the police defendants behaved in an objectively reasonable manner when they arrested McDonnell. Because the plaintiff produced evidence creating a genuine issue of fact regarding the existence of

probable cause to arrest Mr. McDonnell, the district court appropriately declined to assess the defendants' objective reasonableness.

Appellee's Brief at 6–7.

The Supreme Court has explained that we should ask whether the police acted reasonably under settled law in the circumstances. We believe they did. Yauch testified about her recantation before the state court at the hearing held to determine the viability of McDonnell's conviction. Tr. of 4/27/89 at 21. She stated that she told her friend when she left the pavilion that a man had tried to rape her. *Id.* She stated that a park employee overheard this comment and questioned her about it, and then called the police. *Id.* She testified that she lied to the police and fabricated an involved story about an attack, and got her friends to support her. *Id.* at 20–21. Yauch testified that she told the same story to the district attorney and at the preliminary hearing in McDonnell's criminal case. *Id.* at 21–22. She further testified that on the day she complained to the police, she did not know McDonnell or anything about his prior record for assaulting children, *id.* at 27, 30, but she did testify that one of the officers told her on April 12 that the man who attacked her was wanted "all over for rape." Tr. at 30, 31, 32.

Although it is never expressly set out, McDonnell's theory of the case seems to be as follows: Pfannerstill saw McDonnell in the park on April 12 and recognized him as a convicted sexual offender. He heard Yauch telling her friend that a man tried to rape her. He asked her to accuse McDonnell; Yauch agreed and the police were called. While she was waiting, Yauch cooked up the detailed story of her attack and enlisted her friends to corroborate her story. The police arrived and were informed that no attack occurred, but that McDonnell should be put away on false charges. They agreed and pressured Yauch to join the conspiracy and provide the false story they needed to justify McDonnell's arrest and to prosecute him. The rest is history.

In her affidavit Yauch said: "My false story was the result of being requested to do something by the man who first contacted me at the park after Mr. McDonnell left. It further was the result of great pressure by the police to give them a story about what happened that would help to 'put him away' so that 'he won't see the light of day.'" Yauch Affidavit at 2–4. In his brief to this court, McDonnell provides the following interpretation of this testimony: "Cathleen Yauch, the girl Pfannerstill allegedly overheard, testified under oath that she made the alleged statement that a man had tried to rape her as a result of being requested to do so by defendant Pfannerstill." Appellee's Brief at 1.

The record shows that Yauch lied to her friends and to police about her encounter with McDonnell. She told them an elaborate story about a sexual assault, and talked one of her friends into supporting her story to the police. She gave the police a detailed description of McDonnell. All of the police officers testified that they did not know the identity of Yauch's assailant until his arrest on April 15. Yauch identified him in a police line-up on April 16, and on that day or shortly thereafter the police discovered McDonnell's prior conviction for second degree sexual assault of a 12 year old boy.

Yauch came forward with the truth four years later. She says she lied because she was "requested to do something by the man who first contacted me," who McDonnell says was Pfannerstill. She did not tell the police that Pfannerstill asked her to tell this story, and she does not explain why she told her friend she was raped before Pfannerstill approached her. The record simply does not support an inference that the police conspired with Pfannerstill or the girl to trump up charges against McDonnell.

That the police urged Yauch to tell them about the man whom they believed assaulted her did not violate McDonnell's constitutional rights. This court has noted that young sexual assault victims are often reluctant to tell their stories. *See Doe v. United States,* 976 F.2d 1071, 1074 (7th

Cir.1992). Yauch in no way indicated that the police asked her to lie, they just pressured her to tell her story. We do not believe that police officers who assure children whom they believe have been assaulted that they will be safe if they tell their stories violate the suspect's constitutional rights. In this case the officers assured Yauch that her attacker would be "put away for life," and "will never see the light of day". Of course police officers may not suborn perjury, but we do not believe McDonnell has pointed to any record evidence that they did. Pfannerstill heard Yauch tell her friends that a man tried to rape her; his supervisor called the police, and the police pressured her to tell them what happened. A reasonable police officer could have believed, based on the detailed story and physical description Yauch provided, together with the corroboration of her friends and Pfannerstill's statement, that they had probable cause to arrest the man Yauch described.

The only thing in the record which raises even a minimal question about whether probable cause existed is Yauch's statement that she was told on April 12 that the man who attacked her was wanted all over for rape. The issue here is whether this statement supports an inference that the police conspired to arrest McDonnell on false charges.

McDonnell claims that part of the pressure put on Yauch to join the conspiracy apparently was the assertion that McDonnell was wanted all over for rape. The sole support in the record for McDonnell's unlikely conspiracy scenario is Yauch's report that the police accused McDonnell of rape on April 12. We believe this single statement is simply too thin a thread on which to hang the elaborate conspiracy theory. The record simply does not support McDonnell's allegation that the police knew Yauch made up the story about McDonnell's attack. We believe that a reasonable police officer could have believed Yauch's story, as did the judge at the preliminary hearing in McDonnell's criminal case. Yauch's story, together with the corroborating statements from her friends and her detailed description, support a reasonable belief that probable cause existed for McDonnell's arrest.

## III.

For the foregoing reasons, the decision of the district court is reversed, and we remand the case for proceedings consistent with this opinion.