**Leon DUKES, Sr., Plaintiff,**

v.

**ILLINOIS CENTRAL RAILROAD COMPANY, Defendant.**

No. 94 C 4134.

United States District Court, N.D. Illinois, Eastern Division.

March 20, 1996.

Louis C. Cairo, Edward Pirok, Goldberg, Weisman and Cairo, Ltd., Chicago, IL, for Plaintiff.

William T. Weaver, Michael P. Hannigan, Lord, Bissell & Brook, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Before the Court is Defendant Illinois Central Railroad's ("ICRR") Motion for Summary Judgment. Plaintiff Leon Dukes ("Dukes"), an employee of the ICRR, filed a Complaint seeking damages against the ICRR in an action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, alleging that he developed Carpal Tunnel Syndrome ("CTS") due to the ICRR's negligence.

## I. FACTUAL BACKGROUND

On July 7, 1994, Dukes filed a Complaint in this Court seeking recovery under FELA for his carpal tunnel problems. Plaintiff specifically alleges that on and prior to August 1, 1991, Plaintiff carried oil cans, signal lights, and step jacks in the course of his employment. Plaintiff claims that his injuries and damages are the result of the ICRR's negligence in failing to provide Plaintiff with safe tools and equipment to assist him in his work, with proper training on methods of work, with supervision of the work, and with warnings of the dangers of the work. Plaintiff seeks damages exceeding $50,000 for his physical injuries, including but not limited to bilateral CTS, and for his pain and mental anguish, which he has suffered and continues to suffer.

Dukes was hired by the ICRR in 1957 at the age of 20. He worked as a "Helper" for about four years, carrying oil cans, waste cans and assisting the carmen, before becoming an "Oiler," and eventually becoming an inspector. Dukes held the position of inspector for 30 years, working the first 25 years in the "C-yard." His primary responsibility was to inspect the trains and identify those in need of repair. The "C-yard" was separated by an overhead wire, and Dukes inspected the cars at the north end of the train. On average, Dukes inspected five trains per night, each train taking approximately 25 minutes, working an eight hour shift with no overtime.

During an inspection, Dukes walked down one side of the train connecting air hoses, changing worn brake shoes, oiling when needed and visually inspecting the cars for obvious damage or defects. Once he reached the "wire," he would cross over to the opposite side and walk back. When he connected the air hose at the end of each car, he set his oil can down, and when he ran out of oil in the can, he would return to the supply drum and refill the can. When the railroad converted to frictionless roller bearings in the early 1980's, Dukes used only one to two cans of oil per night rather than 20 to 30 cans per night as he had before the switch.

Dukes never experienced any numbness or tingling in his fingers in the 25 years he worked as a car inspector in the "C-yard," nor had he experienced any numbness or tingling in his fingers when working as an "Oiler" or "Helper" before that. In the mid-80's, Dukes transferred to the "F-yard" where he continued to perform the same tasks as he did before, except that he worked in the daytime and he inspected only one to two trains per eight hour shift, taking breaks and completing paper work between inspections. In the "F-yard," Dukes also performed the additional task of installing and removing signal lights, which replaced the caboose in 1984.

Installing and removing the signal lights is done standing on the ground and lifting the light, with both hands, in and out of the bracket on the coupler at the hind end of the train. It takes a matter of minutes to per-

form this function, and Dukes installed approximately two or three lights per shift. Dukes carried the lights to and from a pick-up truck, which was used to transport the lights to the shanty where they were stored, and from the shanty to the train. The lights, like the oil cans, were carried by a handle, so when one hand got tired, Dukes switched hands or set the light down to take a break. In February of 1992, Dukes exercised his seniority to bid for and received an assignment as a helper on the repair track, where he drove fork lift trucks and other equipment rather than performing the tasks of a car inspector.

In working as a car inspector, Dukes claims that he routinely complained of the difficulties he experienced in performing his job duties, and that his tasks required non-stop use of his hands. Dukes did not miss any time from his work prior to June of 1991 from complaints associated with numbness or tingling in his hands and fingers. Dukes states that he was working under pain in order to meet "quotas." He further alleges that he was unaware of the fact that the nature of his work duties caused him to develop bilateral CTS.

The ICRR asserts that a search by the Illinois Central Risk Management Department reveals that Dukes is the first car inspector in the 144 year history of the railroad to make a claim related to CTS. Dukes, however, claims that he is aware of one other car inspector who has had surgery for work-related CTS. On March 3, 1993, Dukes completed a Form 475 Injury Report, claiming that his CTS was related to his work as a car inspector.

Chatri Vanagasem, M.D. ("Dr. Vanagasem") noted in June 21, 1991 that Dukes told him that he was experiencing numbness and tingling in his hands and fingers. Dr. Vanagasem ordered an EMG, which was performed in August of 1991, and which confirmed the presence of bilateral carpal tunnel.

On December 10, 1992, Dukes was seen for his hands by Raymond Pierson, M.D. ("Dr. Pierson") who performed a clinical evaluation and took x-rays. Dr. Pierson diagnosed that Dukes suffered from a condition called advanced scapholunate collapse pattern, or SLAC wrist. At the evaluation, Dukes reported that "there is no specific activity which seems to aggravate the condition." Plaintiff now explains that he was unable to identify a specific condition because of the nature of all his work duties combined with his lack of knowledge about the causes and symptoms of CTS.

Dr. Pierson testified that Dukes had fractured his wrists 20 to 30 years previous to the time of the x-rays taken in 1992. These wrist fractures were not treated, and, as a result, they did not properly heal. Over the course of 20 to 30 years, degenerative arthritis developed in both of Dukes' wrists and progressed to the point that the scapholunael bones shifted. Specifically, the carpal bones, the scaphoid and the lunate bones of the wrist had essentially invaded the carpus, impinging upon the median nerve and causing Dukes' CTS symptoms. Dr. Pierson told Dukes at the December 10, 1992 evaluation that his wrist problems were not a condition that developed as a function of repetitive stress over time but one that developed as a result of an acute injury.

Michael Jablon, M.D. ("Dr. Jablon") also examined Plaintiff and performed carpal tunnel release surgeries on both of Plaintiff's wrists. Dr. Jablon testified that he could not express any opinion to a reasonable degree of medical certainty as to whether any of plaintiffs work activities cause CTS. Plaintiff's first designated testifying expert was Marshall Matz ("Dr. Matz"), who found that Plaintiff was "uniquely predestined" to develop CTS because of advanced arthritic changes in his wrists.

In the course of this litigation, Plaintiff has retained Herbert H. Engelhard, M.D. ("Dr. Engelhard") as an expert witness. In an affidavit, Dr. Engelhard summarily states his conclusion that Plaintiff's Bilateral CTS was caused by his work duties at the ICRR and that the nature of his work was such that it was reasonably foreseeable that Plaintiff could sustain CTS.

## II. ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate against a party who fails to make a sufficient

showing to establish the existence of an essential element to its case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of identifying the portions of the record which it believes demonstrate the absence of a genuine issue of material fact and entitle it to judgment as a matter of law. *Id.* at 323, 106 S.Ct. at 2552–53; *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). All the evidence submitted must be viewed in the light most favorable to the non-moving party. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608.

■ Once a properly supported motion for summary judgment has been filed, the non-moving party must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). An issue of fact is genuine only if a jury could reasonably return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. at 2510. Only facts that might affect the outcome of the case are material. *Id.* Therefore, if the evidence provided by the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. at 2510–11.

### B. STANDARD UNDER FELA

■ Under FELA, railroad companies are liable in damages to any employee who suffers injury due to the railroad's negligence. 45 U.S.C. § 51.[1] To recover under FELA, Plaintiff must prove the common-law elements of negligence, including duty, breach, foreseeability and causation. However, the Seventh Circuit has held that "the quantum of evidence required to establish liability in a[ ] FELA case is much less than in an ordinary negligence action." *Harbin v.*

*Burlington N. R.R. Co.,* 921 F.2d 129, 131 (7th Cir.1990); *see also Deutsch v. Burlington N.R.R. Co.,* 983 F.2d 741, 743 (7th Cir. 1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Under the FELA, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury ... for which damages are sought." *Wilson v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 841 F.2d 1347, 1353 (7th Cir.) (citing *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957)), *cert. denied,* 487 U.S. 1244, 109 S.Ct. 1, 101 L.Ed.2d 953 (1988). Discretion to engage in common sense inferences regarding issues of causation and fault is exclusively vested with the jury "in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Walden v. Illinois Cent. Gulf R.R.,* 975 F.2d 361, 364 (7th Cir.1992) (citing *Rogers,* 352 U.S. at 510, 77 S.Ct. at 451).

■ Therefore, the case must be submitted to the jury "when there is even slight evidence of negligence," *Harbin,* 921 F.2d at 131; *Deutsch,* 983 F.2d at 743, whether or not the evidence would also reasonably permit the jury to attribute the injury to other causes as well. *Wilson,* 841 F.2d at 1353. In the instant case, viewing the evidence in a light most favorably to Dukes, this Court must inquire whether a jury may with reason conclude from all the admissible evidence that negligence of the ICRR played a part in Plaintiff's injury. *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 500, 506–07, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957). It is important to note that despite FELA's lower standard of proof, a plaintiff still bears the burden of presenting evidence from which a jury could conclude a "probable" or "likely" causal relationship as opposed to merely a "possible" one. *Edmonds v. Illinois Cent. Gulf R.R. Co.,* 910 F.2d 1284, 1288 (5th Cir.1990) ("plaintiff must show more than a possibility that a causal relation existed") (citing *Moody*

---

1. In enacting the FELA, Congress provided that every railroad "shall be liable in damages to any person suffering injury while he is employed by such carrier ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of [the railroad], or by reason of any defect or insufficiency, due to his negligence ..." 45 U.S.C. § 51.

*v. Maine Cent. R.R.*, 823 F.2d 693, 695 (1st Cir.1987)).

■■■■ Under FELA, a railroad has a duty to provide employees: (1) a reasonably safe work place; (2) safe equipment; (3) proper training; and (4) suitable methods to perform the assigned work. *Aparicio v. Norfolk & W. Ry. Co.*, 874 F.Supp. 154, 158 (N.D.Ohio 1994). Whether the duty has been breached is viewed from an objective standard of reasonableness. The standard is the degree of care a person of ordinary, reasonable prudence would observe under similar circumstances. The scope of the railroad's duty, however, is limited to hazards it could have foreseen. *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 85 (2d Cir.1989).

## C. CAUSATION

The instant case is closely analogous to that of *Zarecki v. Nat'l R.R. Passenger Corp.*, 914 F.Supp. 1566 (N.D.Ill.1996). This Court adopts the reasoning of the Court in *Zarecki* in holding that Plaintiff has not shown that there is a genuine issue of material fact as to the cause of his CTS. Plaintiff claims three factors create a genuine issue of material fact as to whether his work at the ICRR caused his injuries. First, Plaintiff claims that he complained almost daily to his supervisors about the problems incurred when carrying the lights, yet he asserts that Defendant failed to alleviate his problems. Second, Plaintiff alleges that the fact that Defendant's health care provider denied Plaintiff's claim for CTS because it was work related is an admission by Defendant that Plaintiff's work at ICRR caused the injury. Third, Plaintiff presents the affidavit of Dr. Engelhard, who indicated with a reasonable degree of medical certainty that Plaintiff's injuries were caused by his work duties.

The Court finds, first, that Duke's own testimony is not evidence that his CTS was caused by carrying the lights. Second, the denial of coverage by ICRR's health care provider is irrelevant to causation. Third, the affidavit of Dr. Engelhard is inadmissible and may not properly be considered because it has not been supported by sufficient validation to satisfy the *Daubert* test. Finally, even if Plaintiff could prove causation, Plain-

tiff has failed to produce admissible evidence to show that his injury was foreseeable.

■■■■ As to causation, Plaintiff testifies that he complained almost daily to the ICRR of his problems in carrying the signal lights, but that no action was taken to alleviate the problem. Plaintiff offers no corroboration for his assertions, and Defendant denies that such complaints were made. "Self-serving assertions without factual support in the record will not defeat a motion for summary judgment." *McDonnell v. Cournia,* 990 F.2d 963, 969 (7th Cir.1993). Plaintiff contradicts his own assertions by testifying as follows:

Q: Before March of 1993 when you filled out the injury form—Between June of 1991 when you complained to Dr. Vanagasem about tingling and numbness in your fingers to March of 1993, did you ever complain to anyone at the Illinois Central Railroad about tingling and numbness in your hands in connection with carrying signal lights?

A: No, because I couldn't relate what it's coming from. How could I tell anybody that the signal lights got my hands messed up when I don't even know what's wrong with them?

. . . . .

(Deposition of Dukes, pp. 358–59).

■■■■ Plaintiff maintains that the manner in which Defendant required him to perform his job was unsafe. However, Plaintiff does not provide probative evidence to support this contention. Plaintiff claims that he was required to install and remove two or three signal lights per eight hour shift. He had to carry the lights to and from a pick-up truck that carried the lights to the shanty, and from the shanty to the train. (Plaintiff's 12(N) Stmt., ¶ 25). Plaintiff's testimony is only a description of his job, and not evidence that he was required to perform his job in an unsafe manner. In fact, Plaintiff's own testimony is evidence that Defendant did provide a safe working environment to Plaintiff. (Deposition of Dukes, pp. 123, 129, 132, 177, 269, 270, 331, 358, 374, 358, 458). Plaintiff testified in his deposition as follows:

A: The equipment didn't have defects, it was not broken or out of repair. There wasn't any problems that made them difficult to use as they were designed. Tools and equipment were in working order.

(Deposition of Dukes, p. 129).

A: I have no complaints about the design of the signal lights except they're heavy.

(Deposition of Dukes, p. 270).

A: I do not feel that the carpal tunnel syndrome is in any way associated with a lack of training that I received or failed to receive at the railroad. I feel that I did my job safely.

(Deposition of Dukes, p. 458). Accordingly, viewed in the light most favorable to Plaintiff, Plaintiff's testimony fails to raise a genuine issue of material fact as to the safety of his working conditions absent additional evidence suggesting that his work conditions were unsafe.

■ Second, Plaintiff claims that Defendant is precluded from asserting lack of a causal connection between its negligence and Plaintiff's injuries because Defendant's health care provider, Illinois Central Hospital Association ("Hospital Association"), rejected Plaintiff's bill for CTS because his CTS was work-related. However, Plaintiff offers no legal support or evidence that the Hospital Association is an agent of the ICRR and, therefore, that the ICRR is bound by statements of the Hospital Association employee.

In the instant case, the Hospital Association is not the agent of the ICRR because the ICRR does not have the right to control the manner and method in which the Hospital Association decides whether to accept or reject a claim. (Affidavit of David Hall, ¶ 8); *State Sec. Ins. Co. v. Frank B. Hall & Co.*, 258 Ill.App.3d 588, 196 Ill.Dec. 775, 630 N.E.2d 940 (1st Dist.1994) (Under Illinois law, the principal must have the right to control the manner and method in which the agent's work is carried out.). Therefore, any assertion made by the Hospital Association is not an admission of the ICRR regarding whether Plaintiff's work caused his injuries.

Because Plaintiff's own testimony and the statements of the ICRR's health care provider do not create a genuine issue of material fact, Plaintiff's case survives only if Dr. Engelhard's affidavit is admissible expert testimony.

■ In ruling on a motion for summary judgment, this Court may only consider evidence which would be admissible at trial. *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1212 (7th Cir.1993). Expert testimony which is not admissible cannot create genuine issues of fact sufficient to preclude summary judgment. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1337–40 (7th Cir.1989). Conclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a proper motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990) (The object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact."); *see also Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1057 (7th Cir.1994) ("Self-serving assertions without factual support in the record will not defeat a motion for summary judgment.") (internal quotation marks omitted).

■ Defendant claims that Dr. Engelhard's affidavit is not admissible because he is not an expert in the field of CTS and ergonomics and because he did not reach his results by using a scientific method as required under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The party who proffers an expert's testimony bears the burden of establishing its admissibility by a preponderance of proof. *Schmaltz v. Norfolk and Western Ry. Co.*, 878 F.Supp. 1119, 1120 (N.D.Ill.1995) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311,

1316 (9th Cir.1995) ("[T]he party presenting the expert must show that the expert's findings are based on sound science . . .")).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court rejected the "general acceptance" test first employed in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), as the standard for the admissibility of scientific evidence and adopted a standard based on the Federal Rules of Evidence. "[T]he Supreme Court imposed a requirement that with respect to 'scientific' evidence the trial judge under Rules 702 and 104(a) must act as a gatekeeper screening 'scientific' evidence to ensure reliability." M. Graham, *Federal Practice and Procedure: Evidence* § 6652 (Interim Edition) (1995 Supp.) (attached).

■■■ Rule 702 of the Federal Rules of Evidence provides a two-part test in determining the admissibility of expert testimony. First, the court must decide whether the expert testimony could assist the trier of fact in understanding the evidence or determining a fact in issue. Fed.R.Evid. 702. Second, the court must determine whether the witness called is properly qualified to give the testimony sought. *Id.*

Dr. Engelhard is a neurosurgeon, not an expert on SLAC wrists or on the causes of CTS, and he has no experience in the field of ergonomics. (Curriculum Vitae of Engelhard; Deposition of Engelhard, pp. 31–32). Defendants argue that while Dr. Engelhard is a qualified neurosurgeon with expertise in the area set forth in his curriculum vitae, he does not possess the requisite qualifications with respect to the differential diagnosis of CTS and its association with work-related or occupational activities to render an opinion to a reasonable degree of certainty in a case involving the complex orthopedic anomalies of Plaintiff. This Court need not determine whether Dr. Engelhard's medical training and experience is sufficiently broad to encompass the orthopedic intricacies of Plain-

tiff's wrists because Dr. Engelhard's methodology in reaching his conclusions does not meet the requirements of the *Daubert* test.

Rule 104(a) provides that the district court must determine at the outset whether the reasoning or methodology underlying the proffered expert scientific testimony satisfies the *Daubert* test.[2] The Seventh Circuit explained the Supreme Court's holding in *Daubert* as follows:

> In *Daubert*, the Supreme Court of the United States held that the trial court must, under Rule 702 of the Federal Rules of Evidence, exercise 'some degree of regulation of the subjects and theories about which an expert may testify.' [509 U.S. at 589] 113 S.Ct. at 2795. The Court stated that an expert scientific opinion must be grounded in the 'methods and procedures of science,' and must consist of more than simply 'subjective belief or unsupported speculation.' *Id.* The Court added:
>
> > [A]n inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability.

*Deimer v. Cincinnati Sub–Zero Products, Inc.*, 58 F.3d 341 (7th Cir.1994) (footnote omitted) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2795). The Seventh Circuit has interpreted *Daubert* to require the district court to undertake a two-step inquiry, where both steps must be met before the testimony is admissible. *Deimer*, 58 F.3d at 344; *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994).

First, the district court must determine "whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the

---

2. Rule 104(a) provides:
Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court,

subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
Fed.R.Evid. 104(a).

testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.'" *Porter v. Whitehall Lab.*, 9 F.3d 607, 614 (7th Cir.1993) (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795). Second, the district court has to "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying." *Id.* at 616.

*Deimer*, 58 F.3d at 344.

■ In *Daubert*, the Court lists four non-exclusive guideposts which the district court should consider in determining whether the proffered scientific expert testimony fairly can be characterized as a scientific opinion. The nonexclusive factors in *Daubert* are the following: "(1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community." *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 643 (7th Cir.1995); *Deimer*, 58 F.3d at 344; *Daubert*, 509 U.S. at 591–95, 113 S.Ct. at 2796–97; M. Graham *Federal Practice and Procedure: Evidence* § 6652 (Interim Edition) (1995 Supp.). Another relevant consideration is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have devolved their opinions expressly for purposes of testifying." *Daubert*, 43 F.3d at 1317.

The most important of these four factors is whether the proffered theory has been tested. *Stanczyk v. Black & Decker, Inc.*, 836 F.Supp. 565, 567 (N.D.Ill.1993); *Schmaltz*, 878 F.Supp. at 1121. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified." *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796. Courts must exclude "subjective belief or unsupported speculation." *Porter*, 9 F.3d at 614 (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795).

■ The Court agrees with Defendant in holding that Dr. Engelhard's testimony does not satisfy any of the requirements of *Daubert*. There is no evidence that Dr. Engelhard's testimony is based on sound scientific methodology. When asked what methodology he used in reaching his conclusions, Dr. Engelhard responded, "Methodology of talking to Mr. Dukes and reviewing the information that I was given about him." (Deposition of Engelhard, pp. 234–35). Dr. Engelhard asserted in his affidavit that he based his conclusions on his interview and examination of Plaintiff, Plaintiff's medical records, and a review of the depositions and pleadings in this case. (Affidavit of Engelhard, ¶¶ 5–7, 10). Dr. Engelhard testified that he has not performed any independent studies, nor has he reviewed any research for purposes of reaching his opinions. *Id.* at 332–34, 235–37, 259. Therefore, Dr. Engelhard's opinions and conclusions have not been tested as required under *Daubert*.

Dr. Engelhard has failed to present any evidence as to the amount of pressure or repetition necessary to cause Plaintiff's injuries. Dr. Engelhard has not performed any studies or investigations as to Plaintiff's method of carrying the signal lights, or as to what reduction in the length of time or number of repetitions of carrying signal lights would be needed to insure that Plaintiff did not develop CTS. (Deposition of Engelhard, pp. 54–55, 67, 77, 153). Dr. Engelhard testified as follows:

Q: So with regard to carrying signal lights, you have no empirical evidence from either studying it yourself or someone else studying it, the number of minutes or hours a day Mr. Dukes carried signal lights?

A: Only Mr. Dukes would know that, and that's by going from his memory. Perhaps his supervisors might know.

(Deposition of Engelhard, p. 77).

Q: So what you are saying is is [sic] there really is no way to determine at what point Mr. Dukes can be employed as a car inspector and carry these signal lights and not have any greater risk of

developing carpal tunnel syndrome than the general population?

. . . . .

A: I agree to that. It is difficult to say what point.

(Deposition of Engelhard, p. 153).

Dr. Engelhard has not presented any scientific or objective sources to demonstrate the reliability of his opinions. Dr. Engelhard is unable to meet the *Daubert* requirements because he has no factual or scientific basis or empirical data to support his opinions, but rather his conclusions are based merely on his own subjective observations. *See O'Conner*, 13 F.3d at 1106–07 (holding that a physician's expert opinion testimony that he could tell whether particular cataract was caused by radiation just by looking at it was inadmissible because no evidence was offered to prove that radiation-induced cataracts could be identified by mere observation); *Deimer*, 58 F.3d 341 (affirming the district court's exclusion of doctor's testimony regarding causation because the doctor did not conduct any studies or analysis to substantiate his opinion or provide any supporting methodology or protocol). Dr. Engelhard testified as follows:

Q: Doctor, what medical evidence do you have in the form of objective diagnostic studies that would demonstrate that there was a marked change ... in the orthopedic pathology in his wrist from the date he started carrying these signal lights until the time he developed carpal tunnel syndrome?

. . . . .

A: The evidence is based on a clinical impression, not objective scientific data. It is based on my understanding of Mr. Dukes, his occupation, and the carpal tunnel syndrome.

(Deposition of Engelhard, pp. 101–02).

Q: Do you have any empirical, medical or scientific evidence that would support the conclusion that the carrying of signal lights accelerated his carpal tunnel syndrome condition?

. . . . .

A: It's a clinical opinion. It's not empirical, scientific evidence as we've gone through. So the answer is no.

(Deposition of Engelhard, p. 624).

Q: Are you aware of any studies prior to 1991 when Mr. Dukes first presented with carpal tunnel syndrome symptoms regarding the carrying of objects such as signal lights and safe doses or exposures, or make it a compound question, or doses or exposures beyond which the risk of developing carpal tunnel syndrome is increased?

A: And my answer again is I cannot cite you a reference as I sit here today, but Illinois Central Railroad would have access to all the medical information about carpal tunnel syndrome which indirectly would implicate such activities in causing it.

Q: Doctor, are you aware of a strong and statistical correlation between the activities engaged in by Mr. Dukes as a car inspector and the occurrence or incidence of carpal tunnel syndrome?

A: If you are asking me about precise statistics, I would have to say no, but what I have been asked to make is a clinical judgment about what contributed to his condition of carpal tunnel syndrome.

(Deposition of Engelhard, pp. 59–60).

Dr. Engelhard has not come forward with any objective evidence to support his opinion that "based upon a reasonable degree of medical certainty that the Bilateral Carpal Tunnel Syndrome sustained by Leon Dukes, Sr., was caused by his work duties as assigned by the Defendant Illinois Central Railroad Company." (Affidavit of Engelhard, ¶ 8). Dr. Engelhard never conducted any studies, either related or unrelated to this case, of the work activities performed by Plaintiff. (Deposition of Engelhard, pp. 67, 682–84). He has never identified or conducted any studies of the effects of carrying signal lights. *Id.* at 67, 381–82. Engelhard testified as follows:

Q: Have you ever been out to the railroad to observe what a car inspector does?

A: I have ridden on trains and seen people inspecting cars.

Q: Again, Doctor—

A: You mean was I specifically asked by Goldbert, Weisman, Cairo to go out to Illinois Central Railroad to see what a car inspector does, no.

Q: Any other freight carrier railroad, have you gone out to any other railroad to observe what a car inspector does in his day-to-day tasks as a car inspector?

A: No.

(Deposition of Engelhard, p. 67).

Q: Have you interviewed any railroad personnel regarding their personal experiences with the carrying of signal lights?

A: No.

. . . . .

Q: Do you know if [the handle is] on the top, the left side, the right side, the bottom, the back, the front? Do you know where the handle is?

A: Not exactly.

Q: Do you know how these lights are balanced when they are held by the handle?

A: No.

. . . . .

Q: Do you know if Mr. Dukes was carrying these lights in the manner in which they were designed to be carried.

A: I guess that would be an assumption so I would say no.

(Deposition of Engelhard, pp. 682–83).

Q: Doctor, have you, for purposes of this case or any other carpal tunnel matter that you have reviewed, conducted any personal scientific research on the carrying of signal lights and carpal tunnel syndrome?

A: I believe I already answered that, and the answer is no.

Q: Have you done any personal or scientific research regarding the carrying of any objects such as these signal lights and the development of carpal tunnel syndrome?

A: No.

Q: What about scientific studies with carrying and the development of arthritic writs—Have you done any personal research or scientific research or studies with regard to carrying any sort of object and the development of arthritic wrists.

. . . . .

A: No.

(Deposition of Engelhard, p. 382).

Dr. Engelhard did not specify studies or other literature on which he relied to demonstrate how ergonomic studies of other job tasks or wrist functions support his conclusions in this case. Dr. Engelhard testified that he is not aware of any "scientific studies, research or literature that demonstrates that handling these signal lights differently" than the way Plaintiff alleges that he handled them would have prevented Plaintiff from developing CTS. (Deposition of Engelhard, p. 707).

Additionally, Dr. Engelhard's opinion was elicited by Plaintiff specifically for purposes of this litigation. See Daubert, 43 F.3d at 1317. At his deposition, the following colloquy ensued:

Q: Do your opinions and conclusions in this case, Doctor, with respect to the casual relationship between Mr. Dukes' carpal tunnel syndrome and his job as a car inspector grow naturally and directly out of research you have conducted in the area of carpal tunnel syndrome?

. . . . .

A: No.

Q: Do they grow out of scientific research you are or have been involved in as a doctor outside or independent of this or other litigation you may be involved in?

. . . . .

A: No.

Q: Can you tell us, Doctor, what testing you have performed to try to disprove

your hypothesis that carrying signal lights caused Mr. Dukes' carpal tunnel syndrome?

A: None.

(Deposition of Engelhard, pp. 332–33).

Finally, Dr. Engelhard basis his opinions on the self-reported history of Plaintiff. Dr. Engelhard stated:

> Mr. Dukes sat with me and I asked him about the activities that he engaged in and the onset of his symptoms back when he had the carpal tunnel syndrome, and he described activities to me. And, *at that time*, I formed a judgment that such activities could have caused the problem or aggravated an underlying condition.

(Deposition of Engelhard, p. 259) (emphasis added). In addition, he testified as follows:

Q: If the history that Mr. Dukes provided you is not accurate, would that affect the reliability of your clinical judgment that's based upon that inaccurate history?

A: It is possible, yes.

(Deposition of Engelhard, pp. 605–06).

 Accordingly, the Court finds that Dr. Engelhard's testimony is inadmissible. He has not conducted an independent investigation or research into the causes of CTS in general, or, more specifically, whether carrying signal lights causes CTS. He has articulated no technique or methodology by which his conclusions can be scientifically and objectively tested or subjected to peer review. He prepared his testimony specifically for this litigation, and his conclusions are mainly based on the Plaintiff's own description of his work. As a result, Dr. Engelhard's testimony does not meet the requirements of the *Daubert* test.[3]

Under circumstances similar to those presented in the instant case, other federal district court's have found the testimony of alleged experts regarding CTS to be inadmissible. *Zarecki*, 914 F.Supp. at 1573–74 (N.D.Ill.1996), *Hopkins v. NCR Corp.*, 1994 WL 757510 at *8 (M.D.La. Nov. 17, 1994).

In *Zarecki*, the plaintiff alleged that her CTS developed because of her working conditions at a railroad company as a reservation sales agent. *Zarecki*, 914 F.Supp. at 1573–74. The court concluded that an affidavit by the plaintiff's expert, Dr. Farrell, was inadmissible and could not be considered on the motion for summary judgment because his opinion was not "based on any discernable scientific methodology." *Id.* at 1573–74. The court provided the following explanation:

> On the present record, Dr. Farrell's conclusions can only be characterized as his own subjective beliefs as to the cause of Zarecki's carpal tunnel syndrome. None of the *Daubert* factors support the notion that Dr. Farrell's opinion constitutes scientific knowledge. The record fails to indicate whether Dr. Farrell has conducted any studies or analyses to substantiate his views. Dr. Farrell does not allude to any authorities that support his views, nor has he attempted to demonstrate that his views have gained general acceptance in the scientific community. Instead. Dr. Farrell's conclusions are based simply on his own observations, which are insufficient in this case to establish that his views are corroborated by the scientific method.

*Id.* (citations omitted).

In *Hopkins*, the plaintiff claimed that he had developed CTS as a result of operating a check encoding device manufactured by the

---

**3.** Although not argued by Defendant, the Court finds that Dr. Engelhard's affidavit fails to comply with the requirements of Federal Rule of Civil Procedure 56(e). "Rule 56(e) of the Rules of Civil Procedure provides that affidavits supporting and opposing motions for summary judgment must do more than present something that will be admissible in evidence. They shall 'set forth facts' and by implication in the case of experts (who are not 'fact witnesses') a process of reasoning beginning with a firm foundation." *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989).

Furthermore, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Id.* The Court in *Zarecki* found that the affidavit of the plaintiff's expert gave no explanation of the facts or reasoning used in formulating his opinion, and, therefore, his mere conclusions did not satisfy the requirements of Rule 56(e). *Zarecki*, 914 F.Supp. at 1573–74 (N.D.Ill.1996). Similarly, Dr. Engelhard's affidavit gives only his bottom line opinion, without any explanation, and, therefore, is inadmissible because it does not satisfy the requirements of Rule 56(e).

defendant. *Hopkins,* 1994 WL 757510 at *1. The court found the testimony of the plaintiff's expert, Dr. Aghazadeh, inadmissible for the following reasons:

Dr. Aghazadeh does not say what amount of force is considered safe or excessive relative to causing or preventing CTS injuries. There were not tests performed by plaintiff's expert to show that people using input devices requiring less force are less likely to get CTS. Plaintiff has not presented this Court with evidence that Dr. Aghazadeh's excessive force hypothesis was reviewed, or is accepted, by his peers. Nor has the Court been presented with any publication supporting this hypothesis. There is no way of comparing the methodology to any prevailing research standards because no tests were undertaken.

The self-serving conclusions in Dr. Aghazadeh's affidavit, that the principles upon which he based his opinions are scientifically valid, that the principles and methodology he used are widely accepted, and that he has published many articles which reached similar conclusions, is not evidence that allows this Court to make and independent assessment of the reliability of his opinions.... Dr. Aghazadeh speculates that certain characteristics of the proof encoder create or enhance the 'factors.' Yet, he can point to no scientific data or research that supports the alleged causal link between the characteristics of the proof encoder and CTS. The Court cannot hold that a causal theory based on such rank speculation is scientifically reliable.

*Id.* at *8.

Moreover, Defendant has produced evidence that shows it is impossible to attribute Plaintiff's CTS to his working conditions because the pre-existing arthritic condition in his wrists alone could have caused the CTS, even if Plaintiff had kept his hands in his pocket all his life. Neither of Plaintiff's treating orthopedic surgeons, nor Plaintiff's first retained expert, associated his bilateral CTS to his work as a car inspector.

Dr. Pierson, an Illinois Board Certified orthopedic surgeon who examined Plaintiff on December 10, 1992, was not able to establish a causal relationship between Plaintiff's work activities and his CTS. Dr. Pierson testified to a reasonable degree of medical certainty that Plaintiff's CTS would have manifested itself regardless of his activity level because Plaintiff suffered from a pre-existing medical condition known as SLAC wrists. (Deposition of Pierson, pp. 25–25). Plaintiff had fractured both his wrists 20 to 30 years ago, and because the fractures were not treated, degenerative arthritis developed. The arthritic condition progressed until the unhealed bones shifted (subluxed), impinging on the median nerve and resulting in CTS. (Deposition of Pierson, pp. 20, 22). In addition, Plaintiff never told Dr. Pierson that any work activities caused or aggravated his CTS; instead, Plaintiff told Dr. Pierson that there was not a specific activity that aggravated his condition. (Deposition of Pierson, pp. 24–28).

Plaintiff's other treating physician, Dr. Jablon, the Illinois Board Certified orthopedic surgeon who performed carpal tunnel release surgeries on both of Plaintiff's wrists, could not express any opinion to a reasonable degree of medical certainty as to whether any of Plaintiff's work activities caused his CTS. (Deposition of Jablon, pp. 188–19).

Finally, according to the testimony of Dr. Marshall Matz, Plaintiff's first designated testifying expert, Plaintiff was "uniquely predestined to develop carpal tunnel syndrome" because of the advanced arthritic changes in his wrists. (Deposition of Matz, p. 31). Dr. Matz further testified that he could not draw a conclusion as to the cause of Plaintiff's CTS with any medical certainty because:

It's a difficult case because you can look at someone with a pre-existing congenital or developmental abnormality as he has at the wrists involving the orthopedic difficulties that he had, and you can say that makes him uniquely vulnerable; and therefore anything that he did at work may have caused or contributed to his carpal tunnel syndrome.

Or you can say his hands and wrists were so bad that if he kept his hands in his pocket all his life, he would still develop

carpal tunnel syndrome; and I don't know how to sort that out.

(Deposition of Matz, p. 38).

### D. FORESEEABILITY

 Even if Plaintiff had raised a genuine issue of material fact as to causation, Plaintiff can not show that Defendant could foresee Plaintiff's development of CTS. As evidence of foreseeability, Plaintiff first asserts that Defendant knew or should have known that its failure to respond to Plaintiff's routine complaints, and the complaints of his coworkers, about the difficulties encountered when installing the lights on trains would cause injury. Second, Plaintiff also states that a former car inspector employed by the ICRR has suffered from CTS. Third, Plaintiff offers as evidence the affidavit of Dr. Engelhard, where he states in a conclusory fashion that "[i]t is also my opinion that the nature of the work duties at the defendant Illinois Central Railroad Company was such that it was reasonably foreseeable that Leon Dukes, Sr., could sustain Bilateral Carpal Tunnel Syndrome in his hands or wrist or sustain some other hand/wrist injury." (Affidavit of Engelhard, ¶ 9).

First, Plaintiff testified about the general complaints he had made concerning his job, but his complaints had nothing to do with CTS because he did not know of his orthopedic injuries or that the nature of the work contributed to his CTS symptoms. As discussed above, Plaintiff testified that between June of 1991 and March of 1993 he did not complain to anyone at the railroad about the tingling and numbness in his hands being connected to carrying signal lights. (Deposition of Dukes, p. 358). Furthermore, Plaintiff did not tell Dr. Vanagasem, Dr. Jablon or Dr. Pierson, that he associated his injuries to anything work related. Nor does Plaintiff offer any corroborating evidence from his coworkers or supervisors that he or anyone else complained.

Second, the person who Plaintiff claims also developed CTS from his work as a railroad inspector at the ICRR never reported his CTS to the ICRR as a work related injury, nor did he ever complete a Form 475 Injury Report for purposes of claiming his injury as a work related injury. (Affidavit of Harris, ¶ 4). The ICRR asserts that a search by the Illinois Central Risk Management Department revealed that Plaintiff was the first inspector in the railroad's history to make a claim related to CTS. Finally, for the reasons articulated above, Engelhard's affidavit is inadmissible because it fails to meet the requirements of *Daubert*. Accordingly, Plaintiff has failed to show that there is a genuine issue of material fact as to whether the ICRR knew or should have known an unsafe condition existed.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.