Joann **FARMER, Plaintiff,**

v.

**THE CONTINENTAL INSURANCE COMPANY, a New Hampshire insurance corporation, Defendant.**

**No. 95 C 3887.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 24, 1997.

■

William Briskin Kohn, Chicago, IL, for Plaintiff.

Steven L. Gillman, Tamra Sue Domeyer, Fox and Grove, Chartered, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This matter is before the Court on defendant The Continental Insurance Company's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed hereafter, the motion is granted.

## I. BACKGROUND

### A. General

Plaintiff Joann Farmer, a black woman, is a former employee of defendant The Continental Insurance Company ("Continental"). Farmer began her employment in 1986 with Underwriters Adjusting Company ("UAC"), a company owned by Continental. In 1989, Continental closed UAC's claims division. Farmer accepted a promotion to a senior adjuster position in Continental's Overland Park, Kansas office. In 1992, Farmer applied for a supervising adjuster position in Continental's new Continental Risk Management Services ("CRMS") unit in Chicago. She was offered the position.

Farmer began her employment with the CRMS unit in Chicago in March 1993. She supervised six adjusters handling workers compensation and general liability claims. Farmer's unit was responsible for five main accounts—CSJ, Little Sisters of the Poor, Thomson, Homedco, and Elf Aquitaine. Farmer reported to Claims Manager Bill Stanborski. Stanborski reported to Tory Payne.

During the summer of 1993, Continental was not pleased with the performance of the CRMS unit in Chicago. In June 1993, Stanborski and Payne were terminated. Michael Rabbitt replaced Stanborski and Deborah Finch replaced Payne. Farmer now reported to Rabbitt, and Rabbitt reported to Finch.

### B. Farmer's Performance

In June 1993, Farmer's performance was evaluated. Farmer received a rating of "3," which indicated that she met all expectations.

In July 1993, one of the adjusters in Farmer's unit handled a claim deficiently. A file reviewer criticized the deficiencies. In response to the criticism, Farmer wrote a note to the adjuster stating that "there is always the next time," and she drew a happy face next to her comment. In September 1993, Rabbitt wrote that Farmer's notation was "not an acceptable response."

Also in July 1993, Finch notified Farmer of problems with the Thomson account—one of the five main accounts handled by Farmer's unit. Farmer concluded that the bulk of the problems existed prior to her unit's servicing of the account. Farmer stated that if CRMS lost the account she accepted no responsibility for the loss.

In August 1993, Rabbitt stated that Farmer failed to show up or find a replacement for her preassigned mail room duty on the morning of August 10. Rabbitt indicated in a note to the file that Farmer told him that she "forgot" she was scheduled to work the mail room on that day. Farmer does not recall the incident. Despite Rabbitt's note to the file, Farmer believes that it is "highly possible" that Rabbitt fabricated the incident.

On August 24, 1993, Farmer received a "verbal warning" from Rabbitt and Finch. Farmer was written up for several work product deficiencies. Farmer concedes some of the deficiencies, but she also believes that many of the criticisms were fabricated by Rabbitt and Finch. Rabbitt and Finch identified specific "required improvements" for Farmer to meet. Surprisingly, Farmer concedes that all of the "required improvements" were reasonable except for one.[1]

---

1. The Court is surprised by Farmer's concession because if the criticisms were truly fabricated or inaccurate—as Farmer claims—how can the "required improvements" be reasonable? In other words, if Farmer's performance was up to par, why would she need to improve in the identified

With some modification, Farmer conceded that the final "required improvement" was also reasonable. She agreed to try and meet the "required improvements." Farmer submitted a written response to the verbal warning. In the response, she stated that her job was difficult due to stressful conditions which contributed to the loss of two adjusters from her unit. A third adjuster was promoted out of her unit. Until the vacant positions were filled, Farmer stated that she had to do the extra work.

Farmer agreed to submit a plan of action regarding overdue bills on the Little Sisters of the Poor account by September 1, 1993. Farmer cannot recall if she submitted such a plan. Rabbitt stated that he never received the plan of action from Farmer.

Approximately 30 days following the verbal warning, the warning was lifted due to Farmer's compliance with the required improvements and the general improvement in her performance.

In a memo dated August 27, 1993, Ray Luckhaupt, an account executive, advised Farmer that files for two claims were not set up correctly. Farmer stated that the problem was not unique to her unit and that it was the fault of the clerical supervisor.

On October 15, 1993, Farmer left work early and missed an important supervisors meeting scheduled by Rabbitt. After the meeting, Rabbitt found a note from Farmer in his "in box" explaining her absence. Rabbitt wrote that the note was not acceptable notice and Farmer's actions were not acceptable behavior for a supervisor. Farmer was charged half of a personal day for leaving work early. In a written response, Farmer stated that it was in her best interest to reconsider her loyalty to the department. If Rabbitt did not reconsider his decision, Farmer stated that she would be modifying her extended work schedule and work less hours.

In a note to the file dated December 1, 1993, Rabbitt noted that Farmer was late for the third time for a supervisors meeting.

Farmer contends that the note is a fabrication and "totally false." Farmer believes that the note was created some time after December 1, 1993, to "paper her file."

In Farmer's performance evaluation for the period of August through December 1993, Farmer received an overall rating of "marginal contributor," which means that she met expectations in most areas. The evaluation noted numerous deficiencies in Farmer's performance. Farmer responded in writing to the evaluation. She noted that Rabbitt appeared to focus on negatives and build his assessment on isolated incidents. She admitted that everything requested of her was "not done as timely as they could be if I spent the night in the office, but some things are done on time."

There were problems with the Little Sisters of the Poor account. In a memo dated January 15, 1994, Rabbitt stated to Farmer that we "must aggressively follow up on all of our promises" to Little Sisters of the Poor. Rabbitt set a meeting for March 1, 1994. Farmer does not recall receiving the memo, but cannot think of any reason why she would not have received it.

On January 21, 1994, Rabbitt sent Farmer an e-mail. The e-mail reminded Farmer of the next Little Sisters of the Poor file review and of a meeting with the broker assigned to that account on February 8, 1994. Rabbitt told Farmer that he needed updated status reports by February 2, 1994. He also noted that it was "critical" that they showed progress on this account. Rabbitt met with Farmer on February 2, 1994. Farmer had not retrieved the January 21, 1994, e-mail yet. It was Farmer's duty to check her e-mail every day.

Farmer is uncertain as to whether she met the February 2, 1994, deadline. Rabbitt and Finch state that Farmer missed the deadline. According to Rabbitt and Finch, the reports were deficient and were not completed until the evening of February 7, 1994.

On February 6, 1994, Rabbitt noted that Farmer had been late turning in monthly

---

areas? To be consistent with Farmer's contention that Rabbitt and Finch were fabricating her deficiencies, shouldn't Farmer have stated that

the "required improvements" were also fabricated or unreasonable since she was already performing adequately?

reports. Rabbitt's notes reflect that Farmer had consistently missed deadlines and failed to turn in work. Farmer does not recall if she missed deadlines or failed to turn in work.

In a memo dated February 10, 1994, Rabbitt outlined Farmer's performance deficiencies and placed her on "Corrective Action/Written Warning." The memo criticized Farmer for failing to submit the Little Sisters of the Poor reports on time. Farmer does not recall whether the criticism was accurate. Rabbitt also, among other things, criticized Farmer for being deficient in the area of "assignment completion" and her tendency to show up late for meetings. Farmer responded in writing to the memo. Her response disputes the accuracy of the criticism. Rabbitt listed three "required improvements:" (1) completing and updating the review sheets for the Little Sisters of the Poor account by February 24, 1994; (2) turning in all reports and assignments on time, turning in delinquent reports, and improving overall responsiveness to management and client requests; and (3) creating a staffing analysis and recommendation by March 8, 1994. Farmer, once again, conceded that the "required improvements" were reasonable.[2]

On February 10, 1994, Farmer received a memo from Rabbitt regarding questions remaining after the pre-meeting with the Little Sisters of the Poor broker. The memo requested certain information by March 1, 1994. Farmer did not personally prepare the requested information. Instead, she assisted the adjuster with rough drafts and discussed the information to include. Once again, Rabbitt and Finch had to complete the reports the night before the deadline.

On February 15, 1994, Farmer was scheduled to work extended hours. Farmer, however, was on vacation that day. She was required to find another supervisor to fill in. Farmer failed to find a substitute.

Farmer had reports due on February 25, 1994. Rabbitt says Farmer never turned in the reports. Farmer does not believe that she failed to turn in a required report on time.

## C. *Farmer's Demotion*

On March 2, 1994, Rabbitt and Finch met with Farmer to discuss their concerns with her performance. Farmer was removed from her supervising adjuster position. Finch had ultimate responsibility for the decision.

On March 11, 1994, Farmer received a memo from Rabbitt summarizing the March 2, 1994 meeting. Rabbitt indicated that Farmer was not complying with the "required improvements" identified previously. Farmer disputes the accuracy of some of the specified deficiencies in the March 11 memo.

Farmer was eventually placed on probation for 30 to 60 days and reassigned to a senior adjuster position in the run-off unit. Her salary did not decline.

## D. *The Closing of the CRMS Unit in Chicago*

The Chicago CRMS unit was eventually closed and the work transferred to the Downers Grove office. Rabbitt offered Farmer a senior adjuster position in the Downers Grove office at her same rate of pay. Continental also agreed to pay Farmer $200 per month for transportation expenses—Farmer wanted approximately $300 per month. Farmer declined the job offer.

In October 1995, after she rejected the Downers Grove position, Farmer received a raise.

On November 17, 1995, Farmer terminated her employment with Continental.

## E. *Farmer's Criticism of CRMS Management*

In a memo dated March 2, 1994, Farmer noted that the working conditions were "almost unbearable" and that employee morale was at an "all-time low." Specifically, Farmer stated that the demands and expectations of upper management were too high; employees were required to work unreasonable hours; employees were frequently threatened with corrective actions and the possibility of termination; and that some of the

---

**2.** *See* footnote 1, *supra.*

employees had developed illnesses or injuries due to the aggressive work routine and stressful working environment. Farmer stated that she was expressing the concerns of at least 85 % to 90% of the CRMS staff.

Farmer also indicated that she felt she was demoted because she was the only black supervisor. Farmer felt that Finch treated black employees more harshly than white employees.

### F. Farmer's Complaints About Wage Disparities

In August 1993, Farmer informed Finch about perceived wage disparities between black and white supervisors. Finch deferred the matter to Don Avery—Director of Human Resources. Farmer's concerns were based on her personal opinion that other supervisors were paid more than her. Farmer never conducted a study of wages of black and white employees, nor did she ever make a comparison between herself and other supervisors in terms of seniority or experience as a supervisor.

On February 28, 1994, Farmer sent a memo to Avery reiterating her concerns about wage disparities. Avery, who is black, found no wage disparities between black and white employees.

### G. Farmer's Complaint

Farmer's complaint alleges that she was demoted because she is black in violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e, *et seq.* Farmer also alleges that her demotion was in retaliation for her complaint regarding wage disparities between black and white employees.[3]

## II. DISCUSSION

Following a statement of the summary judgment standard of review, the Court will address Farmer's claims.

**3.** Farmer also brought causes of action based on promissory estoppel and equitable estoppel, but

### A. Summary Judgment—Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.,* 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist,* 833 F.2d 639 (7th Cir.1987).

### B. Title VII and 42 U.S.C. § 1981—Disparate Treatment

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race. 42 U.S.C. § 2000e–2(a)(1). Section 1981 "addresses racial discrimination in contractual relationships." *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir. 1996). Claims under Title VII and § 1981 are analyzed in the same manner. *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 176 (7th Cir.1996). Accordingly, Farmer's racial discrimination claims under Title VII and § 1981 will be analyzed together.

those counts were voluntarily dismissed.

Racial discrimination may be established in either of two ways—through direct evidence or via the indirect burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir.1991). Farmer proceeds under both methods; the Court will analyze each method in turn.

### 1. Direct Evidence

■ Under the direct evidence method, "plaintiff initially must prove 'through direct evidence that the employment decision at issue was based upon an impermissible factor.'" *McCarthy*, 924 F.2d at 686. "Once the *prima facie* case has been made, 'the defendant must respond by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the impermissible factor into account.'" *Id.*

■ Farmer argues that she has direct evidence that her demotion was based upon race. Her "direct" evidence consists of: (1) an October 1993 incident between Finch and a black adjuster—Patricia Jackson—where Finch stated that "I was told to fire you and a few more around here;" following the incident, Finch then stated that this "is not a black thing;" and (2) an incident between Finch and supervisor Craig Hardt a couple of months before Farmer's demotion where Finch referred to Farmer as "uppity" and stated that she was raised in a college town and had never considered herself bigoted, but "she would never hire another one of those."

■ The two incidents are not direct evidence that race played a role in Farmer's demotion. Direct evidence is that which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989); *Hunt–Golliday v.*

*Metro. Water Reclamation District of Greater Chicago*, 104 F.3d 1004, 1010–11 (7th Cir. 1997). Thus, in order to qualify as direct evidence, the "evidence must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle*, 876 F.2d at 569.

Here, the statements made by Finch do not relate to the specific employment decision in question—Farmer's demotion. Indeed, each incident occurred months before Farmer's demotion. Farmer wants the trier of fact to conclude that the statements evidence racial animus on Finch's part and that Farmer's demotion was the result of Finch's racial animus. Such a conclusion can be reached only by adopting certain inferences and presumptions, *i.e.*, the fact finder must conclude that Finch's statements reflect racial animus and infer that such racial animus played a role in Farmer's demotion. That, by definition, is not direct evidence. *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997) ("[D]irect evidence would be what [defendant] and its employees said or did in the specific employment decision in question. . . .").

### 2. Indirect Burden–Shifting Method

■ To establish a *prima facie* case under the indirect burden-shifting method of proof enunciated in *McDonnell Douglas*, Farmer must show: (1) that she belongs to a protected group; (2) that she performed satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that similarly situated employees outside the classification received more favorable treatment. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994).

■ Continental argues that Farmer cannot establish a *prima facie* case because she failed to perform satisfactorily. Surprisingly, Farmer concedes in her response[4] to Continental's motion for summary judgment that she did not perform satisfactorily.[5] In-

---

4. *See* response, page 6 ("Rather, she need only show that though the performance of other (White) supervisors was *similarly deficient* or *similarly criticized* by defendant, they were not demoted, and were given greater opportunities

than she to remedy the perceived performance deficiencies.") (emphasis added).

5. The Court is surprised by Farmer's concession because her deposition testimony appears to support the position that she did in fact perform

stead, Farmer attempts to establish a *prima facie* case by showing that white supervisors also performed deficiently, but were not treated as harshly as Farmer.

Although surprised by her position, the Court agrees that Farmer's method is a valid means of establishing a *prima facie* case, assuming that she can show that the white supervisors were similarly situated, *i.e.*, that they performed in a similarly deficient manner. *See Koerts v. MCI Telecommunications Corp.*, No. 95–1039, 1997 WL 30987, at *8 (N.D.Ill.1997); *Shaw v. The Tigon Corp.*, No. 89–403, 1993 WL 420987, at *6 (N.D.Ill. 1993). As discussed below, the Court, however, does not believe that Farmer has come forward with enough evidence that the white supervisors were similarly situated; thus, Farmer has failed to establish a *prima facie* case and Continental is entitled to summary judgment.

In her response, Farmer identifies two white supervisors who were allegedly similarly deficient—Doris Balsamo and Craig Hardt. Farmer states that Balsamo received a "marginal contributor" rating on her performance review for the period ending December 31, 1993. Balsamo's performance review indicated that her monthly reports were occasionally late. Finally, Farmer notes that Balsamo was placed on corrective action, but not demoted. Regarding Hardt, Farmer states that he was also criticized for "improper diary control" and placed on written warning in March 1994, but was not demoted.

Simply stated, the Court fails to see how Balsamo and Hardt's performance deficiencies are similar to Farmer's deficiencies. Indeed, as discussed in the "Background" portion of this opinion, it appears that Farmer had a recent history of constant and ongoing performance problems. To begin,[6] in July 1993, Farmer's drawing of a happy face and statement that "there is always the next

time" was deemed by Rabbitt to be an unacceptable response to a file reviewers criticism of one of her adjusters. In August 1993, Farmer received a "verbal warning. " She was written up for numerous work product deficiencies. She believes some of the deficiencies were fabricated, but she conceded the rest. Furthermore, she conceded that the "required improvements"—which of course suggest that her performance was lacking—were reasonable.

Next, Farmer agreed to submit a plan of action regarding the Little Sisters of the Poor account by September 1, 1993. Rabbitt never received the report. On October 15, 1993, Farmer left work early and missed an important supervisors meeting. Rabbitt noted that Farmer's conduct was not acceptable behavior for a supervisor. In response, Farmer stated that she would reconsider her loyalty to the company.[7]

In January 1994, Farmer neglected to retrieve an important e-mail in a timely manner. In February 1994, Farmer submitted deficient and untimely reports regarding the Little Sisters of the Poor account. Farmer was ultimately placed on "Corrective Active/Written Warning." Once again, Farmer conceded that all of the "required improvements" pertaining to her performance deficiencies were reasonable. Also in February 1994, Farmer was told to prepare certain reports by March 1, 1994. The reports were deficient. Finally, on February 15, Farmer failed to find a substitute supervisor to work extended hours while she was on vacation.

How is Farmer's situation similar to Balsamo's situation? True, Balsamo received a "marginal contributor" rating and was placed on "corrective action" like Farmer, but the Court doesn't know why, other than the fact that she submitted some reports late. Farmer, on the other hand, had numerous perfor-

---

satisfactorily. Indeed, a common theme running through Farmer's deposition testimony is that Continental's criticisms of her performance were nothing more than fabrications. Accordingly, if Continental fabricated Farmer's deficiencies, why is Farmer conceding for purposes of her *prima facie* case that she performed deficiently? Shouldn't she be arguing that she performed satisfactorily and that Continental's criticisms are fabrications?

**6.** Farmer claims that many of Continental's criticisms of her were fabricated. The Court will focus on only those criticisms that are undisputed.

**7.** What type of organization would want a managerial employee who is not loyal to the company?

mance deficiencies. Furthermore, Balsamo may have improved her performance, where Farmer continued to decline.

Regarding Hardt, how can one possibly compare Farmer's situation to the fact that Hardt was criticized for improper diary control and placed on written warning? What was Hardt's performance like prior to the criticism? What was it like after? Once again, the Court fails to see a continuous, ongoing pattern of deficient performance that is present when reviewing Farmer's performance.

Accordingly, the Court must conclude that Farmer failed to establish that similarly situated white individuals performed in a similarly deficient manner, but were treated less harshly. Thus, Farmer failed to establish a *prima facie* case of racial discrimination and Continental is entitled to summary judgment.

## C. *Retaliation*

[8] Farmer also alleges that she was demoted in retaliation for complaining about wage disparities between black and white employees. Retaliation cases are analyzed under a variant of the *McDonnell Douglas* test. To establish a *prima facie* case of retaliation, Farmer must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir.1994).

Continental concedes the first two elements of the *prima facie* case, but argues that Farmer cannot establish a causal link between her complaints about wage disparities and her demotion—the third element of her *prima facie* case. The Court disagrees.

Farmer complained to Finch about perceived wage disparities in August 1993. Finch deferred the issue to Avery. On February 28, 1994, Farmer submitted a memo to Avery complaining about the wage disparities. Two days later, Farmer was demoted. Just prior to her demotion, but after the February 28, 1994, memo was sent, Finch, Rabbitt, and Avery met to discuss Farmer's situation. Thus, one could infer that Avery informed Finch—who had ultimate responsibility for demoting Farmer—about Farmer's wage disparity concerns at the meeting. And, because the demotion occurred shortly after the meeting, one could infer that Farmer was demoted based on her complaints about wage disparities. *Dey*, 28 F.3d at 1458 ("Generally, a plaintiff may establish such a [causal] link through evidence that the discharge took place on the heels of protected activity.") Accordingly, Farmer has established a *prima facie* case of retaliation.

Now——at the second step of the *McDonnell Douglas* test—Continental must establish a legitimate, nondiscriminatory reason for Farmer's demotion. It does that—it claims that Farmer was demoted as a result of her poor performance. As discussed above, there is substantial evidence of Farmer's performance deficiencies.

At the third step of the *McDonnell Douglas* test, Farmer must show that Continental's reason for her demotion is pretextual and that the real reason was discriminatory—in retaliation for her complaints about wage disparities. Farmer's evidence of pretext consists of the racist remarks made by Finch to Jackson and Hardt (discussed when analyzing Farmer's direct evidence claim of disparate treatment) and her denial of many of the claims of poor performance attributed to her by Finch and Rabbitt.

The Court cannot accept Farmer's position. Farmer wants the Court to believe that because she created factual disputes as to whether some of the alleged deficient conduct on her part actually occurred and Finch's racist comments months before the demotion decision, Finch and Rabbitt's credibility is now in question and the jury must now decide whether she was terminated in retaliation for complaining about wage disparities. Because of the large amount of undisputed evidence of Farmer's performance deficiencies (as discussed when analyzing her disparate treatment claim under the indirect method), the Court disagrees. In the Court's opinion, the evidence establishes that Farmer was terminated due to deficient performance and not in retaliation for complaining about wage disparities.

### III. *CONCLUSION*

Continental is entitled to summary judgment on Farmer's disparate treatment and retaliation claims.[8] Summary Judgment is, therefore, entered in favor of defendant, The Continental Insurance Company and against the plaintiff Joann Farmer.

---

**8.** Farmer filed a motion to strike portions of Finch's affidavit. Because the resolution of the summary judgment motion was not impacted by the disputed portions of Finch's affidavit, the motion is denied as moot.