Margo C. RUDD, Plaintiff,

v.

CHICAGO ASSOCIATION FOR
RETARDED CITIZENS,
INC., Defendant.

No. 96 C 6818.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 16, 1999.

Margo C. Rudd, Chicago, IL, Pro se.

Lawrence I. Kipperman, Sonja L. Leng-
nick, Sidley & Austin, Chicago, IL, for Chica-
go Association of Retarded Citizens, defen-
dants.

### OPINION and ORDER

NORGLE, District Judge.

Plaintiff Margo Rudd ("Rudd") filed the
instant action alleging wrongful discharge in
violation of Title VII of the Civil Rights Act
of 1964, as amended ("Title VII"). *See* 42
U.S.C. § 2000e–2 *et seq.* Before the court is
Defendant Chicago Association For Retarded
Citizens, Inc.'s (CARC) Motion for Summary
Judgment. For the following reasons, the
motion is granted.

## I. BACKGROUND[1]

CARC is a not-for-profit corporation that
provides services for over 1500 developmen-

---

1. The undisputed facts are taken from the court's    reconciliation of the parties' Local Rule 12(M)

tally disabled adults and children in the Chicago area. As part of its services, CARC operates residential facilities, vocational workshops, and special education schools that provide special intensive teaching and therapy to severely mentally disabled children. In 1968, CARC hired Rudd as a diagnostician. She later became the Director of CARC's Mary Alyce School. As Director, Rudd was responsible for supervising and hiring staff, and implementing curriculum.

In April of 1982, Tim Monahan ("Monahan"), CARC's Director of Children Services, noticed certain deficiencies in Rudd's performance. On April 2, Monahan sent Rudd a letter regarding deficiencies in record keeping that he discovered during a visit the previous day. Five days later, Monahan suspended Rudd without pay because she improperly closed the school the previous day. Without citing to the record, Rudd claims that she was never suspended and that her pay was reinstated.

More warnings followed in 1984 from Douglas Brandow ("Brandow"), Monahan's successor. In March of that year, Brandow sent Rudd a letter regarding her failure to implement new staff hours at the school as she had been instructed to do. In May, during a meeting with Rudd, Brandow expressed his lack of confidence in Rudd's performance as Director, and he informed her that if she did not improve she would be subject to suspension or dismissal. Nevertheless, problems persisted.

In late 1984, Brandow suspended Rudd without pay for approving the installation of a light on school property without administrative approval. In February 1985, he withheld four days' pay from her paycheck because Rudd had taken leave days, and compensation had not been approved for those days. During the following school year, Brandow warned Rudd twice, once for

dismissing students and staff before the end of a school day, and for handling staff disciplinary issues in an unprofessional manner. Further warnings followed in later years. Eventually, in 1987, Brandow placed Rudd on CARC's progressive disciplinary policy. And later that year, after various incidents, Brandow placed Rudd on the "second step" of CARC's disciplinary policy.

Prior to Brandow's actions against her, Rudd began complaining about him. Rudd kept notes of six incidents between June of 1986 and April of 1987. One brief note on Rudd's personal calendar page for January 27, 1987, relates to his sexual behavior. It states that Brandow "[p]laced hands inapprop. in front of genitals, 3:15 p.m." (Rudd Dep., Ex. 17.) Other notes relate to work-related issues and are essentially a record of events and conversations Rudd had with Brandow. In short, Rudd believed that Brandow was arbitrary in his decisions. One note reflects her frustration as she refers to Brandow as a "[b]astard." (*Id.* at p. 8.)

In January 1988, Rudd sent a memorandum to Otto Whitehill ("Whitehall"), CARC's Executive Director, wherein she alleged that during a recent directors' meeting, "Mr. Brandow demonstrated overt, vulgar, lower-body gyrations. Mr. Brandow constantly 'accidentally' kicked my legs and ankles and only excused himself on one occasion." (Rudd Dep., Ex. 20.) Rudd claimed that the situation was "intolerable" and requested a meeting with Whitehill. *Id.* In May 1988, Rudd sent a similar memorandum to Brandow and requested a meeting with him. In June 1988, Rudd met with Brandow and Kristin MacRae ("MacRae"), CARC's Director of Human Resources. At the meeting, Rudd presented them with a memorandum outlining her complaints against Brandow. She claimed that she had been "subjected to extreme and persistent cruel harassment" by Brandow. (Rudd Dep., Ex. 15.) She further

and 12(N) statements. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir.1997); *Huff v. UARCO, Inc.*, 122 F.3d 374, 383–83 (7th Cir.1997). The court notes that although Rudd was initially represented by counsel in this case, she responded to CARC's motion without the assistance of counsel. The court will therefore treat Rudd as a pro se plaintiff for purposes of this motion. Unlike most pro se litigants, Rudd

has attempted to comply with the Local Rules; however, her efforts are largely unsatisfactory. But because it is not clear whether Rudd was given adequate notice of the harsh consequences for non-compliance, *i.e.* deem CARC's Rule 12(M) statements admitted, *see Smith v. Severn*, 129 F.3d 419, 425–26 (7th Cir.1997), the court will not strictly apply the Local Rules to Rudd's detriment.

claimed that she was "professionally slandered" and that she was disciplined in violation of her rights. (*Id.*)

On July 15, 1988, Rudd sent MacRae a memorandum stating that she would schedule a meeting with her to discuss the issues presented in the previous meeting. Rudd noted that several members of her staff requested to meet with MacRae regarding Brandow's behavior toward her. MacRae informed Rudd that if any staff members wanted to schedule an appointment with her they were welcome to do so. No staff members contacted MacRae directly, but on July 20, 1988, she received a letter signed by four of Rudd's subordinates requesting a meeting at the school. On July 25, 1988, Mary Garcia ("Garcia"), the school secretary, contacted MacRae by a separate letter and requested that she not be included in the complaint against Brandow. She further stated that she did not witness any of the conduct Rudd claims she had. In a phone conversation several weeks later, Garcia informed MacRae that Rudd was harassing her and trying to get her to say things about Brandow that were not true.

Shortly thereafter, on September 23, 1988, MacRae received another memorandum from staff members requesting a meeting with her. This memorandum was initialed only by the school's social worker, JoAnn Statum ("Statum"), and Garcia. During this time, Rudd was preparing statements for the four complaining employees. She first prepared handwritten statements and then typed statements dated July 1988.[2] All alleged inappropriate behavior by Brandow. Three days later, Garcia again contacted MacRae to inform her that Rudd forced her to type a letter containing falsehoods about Brandow.

MacRae subsequently met with Whitehall to discuss the matter. They were concerned that Rudd was intimidating staff members in furtherance of her complaints against Brandow. On October 17, 1988, Garcia again contacted MacRae to inform her that she wanted to be disassociated with Rudd's complaint. MacRae received a similar letter

from Thelma Johnson ("Johnson"), a teacher, and one of the four individuals who signed the original letter. MacRae also received a packet from another signatory, Ruth Couderc ("Couderc"), the school Matron. Couderc had refused to sign the statement that Rudd had prepared and requested that she sign. Couderc returned the document to Rudd, explaining: "I return this original document, not dictated or prepared by me, unsigned as the allegation or charge is untrue and was never witnessed by me." (Rudd Dep., Ex. 23.) Couderc mailed copies to MacRae.

Ultimately, one statement was signed by Statum, who had earlier canceled a scheduled meeting with MacRae. The 1988 statement alleged that Brandow behaved unprofessionally during a meeting in 1986. Brandow allegedly placed his foot on Statum's desk so that "his genital area was in direct view" of her face, and at some point "manipulated" his crotch area. (Def.12(M) Statement Ex. K.) CARC immediately initiated an investigation. Brandow denied the allegations in a meeting with Whitehill. On October 19, 1988, Whitehill and MacRae met with Statum. During the meeting, Statum said that there had been an incident with Brandow, but she did not consider it sexual harassment. To her it was an "invasion of her space." (*Id.* Exs. M & N.) Statum told Whitehill and MacRae that she signed the letter only because of pressure by Rudd.

In the next two months, MacRae received calls from Theresa Scott ("Scott"), and Barbara Zuick ("Zuick"), two teachers at the school. Both informed her that the allegations were lies. Scott further noted her concerns in this matter because Rudd was her supervisor, and Zuick informed MacRae that Rudd threatened to charge her with insubordination when she refused to sign a statement. In December 1988, Rudd submitted various memoranda describing Brandow's inappropriate conduct. Included with her submissions was a cover letter with signature lines for six employees, which Rudd explained was "to verify that each staff person,

---

2. In her opposition to CARC's motion, Rudd asserts that she received handwritten and verbal statements that alleged inappropriate behavior by Brandow, and that she was given permission by the staff members to type up their individual statements.

read and received a copy of the documented incidents." (Rudd Dep., Ex. 21.) The signature lines were for the four individuals who signed the initial letter to MacRae, as well as for Scott and Zuick. Garcia, Statum and Scott signed the cover letter indicating they "read and received" the statements. Johnson, Zuick and Couderc's lines were not signed; however, Rudd added notations that they were either mailed or received.

On the same day that MacRae received Rudd's packet, Rudd sent a memorandum to Zuick regarding her rejection of the statement. In the memorandum, Rudd stated:

It was my responsibility as Director of Mary Alyce School to ask you additional questions about Mr. Brandow [sic] alleged behavior in your presence. You stated to me that "you might have said Mr. Brandow was nervous," gives credence to the fact, [sic] the [sic] behavior was discussed with me by you at times so stated in the memo.

Mrs. Zuick, please be aware that this is the second incident where you have attempted to recant your statements to me regarding facts which you personally related to me.

Mrs. Zuick[,] I am legally obligated to submit statements of this nature to the Department of Human Service [sic].

Mrs. Zuick[,] I am anticipating a continuous professional relationship with you as Head–Teacher [sic] of Mary Alyce School.

(Rudd Dep., Ex. 22.)

Zuick promptly responded, informing Rudd that Rudd's statements were incorrect and that Rudd had misconstrued her statements about Brandow. Zuick believed that Brandow always acted professionally. After mailing her response to Rudd, Zuick forwarded copies to MacRae. Around this time Scott also sent a memorandum to MacRae in which she denied the statement in Rudd's letter. She stated that she never had any complaints about Brandow.

As part of the investigation into Rudd's allegations, MacRae interviewed Zuick, Garcia and Johnson. Each informed MacRae that Rudd's allegations were fabricated, and that she was lying about the entire situation. The investigation soon concluded with a de-termination that Rudd's accusations were unfounded and that she abused her position. CARC found that staff relations were severely damaged by Rudd's actions, and consequently, that Rudd should be removed from her position. CARC officials nevertheless decided to offer her another position in the agency at the same rate of pay.

On January 17, 1989, Rudd began her new job as Director of Supportive Parenting. The position was part of a new CARC program in which Rudd had expressed interest and which she would develop. The program's purpose was to counsel and assist mentally retarded young women who became pregnant. Rudd did not have supervisory responsibilities and reported directly to Whitehill.

CARC initially funded the program, but due to its limited budget it soon sought outside funding. However, CARC's efforts were unsuccessful. In September 1990, Bill Schneider ("Schneider") replaced Whitehill as Executive Director. In December, Schneider sent Rudd a memorandum asking that she send him any leads she had for funding. Schneider noted that the Illinois Legislature intended to rescind part of the state income tax and informed Rudd that such an event would "have a decided effect on the Agency's budget and on your program." (Rudd Dep. Ex. 34.) On February 7, 1991, Schneider reiterated the need for funding to Rudd and stated: "We will be unable to continue this program if we do not secure funding by July 1. Obviously if we do not secure funding this would jeopardize your position with the agency." (*Id.* at Letter dated February 7, 1991.) A similar letter followed on April 11, 1991, in which Schneider informed Rudd "that without major funding, your program and your employment with CARC will end on June 30, 1991." (*Id.* at Letter dated April 11, 1991.)

Ultimately, CARC did not receive funding and Schneider notified Rudd by letters dated June 10 and 18 that her employment would end on June 28, 1991, due to lack of funding. In the letters, Schneider outlined Rudd's severance pay and other available benefits. Rudd responded by contesting Schneider's decision. She asserted that she was never

informed that her position was contingent upon her securing funding for the program. Rudd further argued that ending the program was "at best premature." (Rudd Dep. Ex. 44.) Nevertheless, pursuant to requests by Schneider, she provided CARC with suggested severance terms. Finally, on June 28, 1991, Schneider decided to terminate the program.

On December 19, 1991, Rudd filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") against CARC, claiming that she was terminated in retaliation for "openly opposing sexual harassment . . . ." (*Id.*, Ex. 51.) The IDHR dismissed the charge for lack of substantial evidence and the decision was affirmed by the Illinois Human Rights Commission. Rudd also filed a charge with the Equal Employment Opportunity Commission, which, in 1996 issued a right to sue letter.

In addition to seeking redress from CARC, in 1995 Rudd sought Social Security Disability Insurance payments. At a hearing before an Administrative Law Judge ("ALJ"), Rudd testified that she stopped working because the stress made it impossible for her to endure a medical condition she had developed called inflammatory bowel syndrome. Following the hearing, the ALJ concluded that Rudd had been disabled within the meaning of the Social Security Act since June 30, 1991, and that she was entitled to disability insurance benefits.

Finally, on October 18, 1996, Rudd filed the present action alleging that CARC wrongfully discharged her in retaliation for filing sexual harassment charges with CARC against Brandow. CARC now moves for summary judgment, arguing that: (1) Rudd should be judicially estopped from asserting that she was terminated for "opposing sexual harassment;" and (2) because Rudd cannot establish a causal link between her opposition to the harassment and her termination.

## II. DISCUSSION

### A. *Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is genuine only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir.1997) (*quoting Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 578 (7th Cir.1994)) (citation omitted).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering all the evidence presented in a motion for summary judgment, a court cannot make credibility determinations. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must "view the record and all reasonable inferences drawn from the record in the light most favorable to the nonmoving party." *Sample v. Aldi, Inc.*, 61 F.3d 544, 546 (7th Cir.1995).

"If the non-moving party bears the burden of proof on an issue, that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact." *Id.* at 547. "[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *Severn*, 129 F.3d at 427 (citations and internal quotation marks omitted). A "scintilla of evidence," or evidence that is "merely colorable" or "not significantly probative," is insufficient. *Anderson*, 477 U.S. at 249–50, 252, 106 S.Ct. 2505. Furthermore, "a plaintiff's speculation is not a sufficient defense to a summary judgment motion," *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir.1993), nor are self-serving assertions lacking factual support in the record. *See McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir.1993) (*citing Kornacki v. Norton Performance Plastics*, 956 F.2d 129 (7th Cir.1992)). Moreover, "[i]f the factual context renders the claims asserted by the party opposing summary judgment implausi-

ble, the party must 'come forward with more persuasive evidence to support their claim than would otherwise be necessary.'" *McDonnell,* 990 F.2d at 967 (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Ultimately, the court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Severn,* 129 F.3d at 427. Accordingly, "if the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance," summary judgment must not be granted. *O'Connor v. Chicago Transit Auth.,* 985 F.2d 1362, 1366 (7th Cir.1993).

## B. Judicial Estoppel

As its first basis for summary judgment, CARC asserts that it is entitled to invoke the doctrine of judicial estoppel. CARC claims that the doctrine precludes Rudd from claiming that she was terminated in retaliation for her complaints of sexual harassment because she testified before the ALJ that she left CARC due to her inflammatory bowel syndrome. The court agrees.

The doctrine of judicial estoppel is an "equitable concept 'intended to prevent the perversion of the judicial process.'" *Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 106 F.3d 1388, 1396–97 (7th Cir.1997) (*quoting In the Matter of Cassidy,* 892 F.2d 637, 641 (7th Cir.1990)). It "prevents a party that has taken one position in litigating a particular set of facts from later reversing its position when it is to its advantage to do so." *Levinson v. United States,* 969 F.2d 260, 264 (7th Cir.1992). "The principal is that if you prevail in Suit # 1 by representing that A is true, you are stuck with A in all later litigation growing out of the same events." *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.,* 910 F.2d 1540, 1547 (7th Cir. 1990); *see also Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1428 (7th Cir.1993) ("By making them choose one position irrevocably, the doctrine of judicial estoppel raises the cost of lying.") The doctrine serves

"to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson,* 969 F.2d at 264.

While the Seventh Circuit has noted that there is no precise definition which can be attached to the doctrine, the court has identified three prerequisites to its application:

First, the later position must be clearly inconsistent with the earlier position. Also, the facts at issue should be the same in both cases. Finally, the party to be estopped must have convinced the first court to adopt its position; a litigant is not forever bound to a losing argument.

*Ezekiel v. Michel,* 66 F.3d 894, 904 (7th Cir.1995) (*quoting Levinson,* 969 F.2d at 264). If these elements are established, a party may be estopped from departing from its previous position. *See Cassidy,* 892 F.2d at 642. However, the Seventh Circuit cautions that judicial estoppel is a matter within the court's discretion, and should not be invoked where it would work an injustice, where the inconsistency was inadvertent, or if there is only an appearance of an inconsistency and the positions may be reconciled. *See id.* Finally, although the doctrine is called *judicial* estoppel, it is equally applicable when a party seeks to repudiate a favorable order from an administrative proceeding in a subsequent judicial proceeding. *See Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1427 (7th Cir.1993); *see also DeGuiseppe v. Village of Bellwood,* 68 F.3d 187, 191 (7th Cir.1995).

Turning to the first of the prerequisites—the inconsistent positions—Rudd now claims that she was terminated because she opposed sexual harassment. In the hearing before the ALJ, the ALJ noted that Rudd alleged that she quit due to her inflammatory bowel syndrome, which "is exacerbated by the stress of employment." (Rudd Dep. Ex. 50 at 2.) Rudd contends that this is inaccurate and that the ALJ misconstrued her testimony in his opinion. A review of her testimony belies her claim:

Q: And why did you stop working in June of '91?

A: June of 91, I had to quit because of the stress-related work that I was doing at the time. Two years prior I had left the school ... so that ... 89, I had left the school proper and went into another program with young adults. The school had—was too much stress for me and I couldn't handle it—I had become ill a that time, and thinking a change with working with adults, it would do better. But the environment, just working with handicapped at the time was too much for my system.

Q: And was the reason you resigned was because it was too much stress?

A: Too much stress, right.

(Def.'s 12(M) Statement, Ex. P (Transcript of audiotape of Social Security Administration hearing).)

Clearly, Rudd's position in this case is inconsistent with her position before the Social Security Administration. The positions cannot be squared—at least one is a lie—indeed, a fraud upon a tribunal. Furthermore, the two actions address the same facts, *i.e.*, the facts surrounding Rudd's departure from CARC. Finally, it is apparent from the ALJ's decision that Rudd convinced the ALJ to adopt her position; her position being that she was disabled from the time she left CARC and that she resigned due to her illness. The prerequisites to applying judicial estoppel are thus established.

Although the court is mindful that the decision to apply judicial estoppel is discretionary in nature, the court can discern no set of facts more compelling than in the present case to apply the doctrine. Rudd is caught in a lie and she must live with it. It would serve no equitable purpose to allow her to avoid the consequences of her actions. Accordingly, Rudd is estopped from claiming that she resigned from CARC on any basis other than for reasons related to her illness. CARC is therefore entitled to summary judgment on Rudd's Title VII claim.

*C. Merits of Retaliation Claim*

Even if judicial estoppel did not apply in this case, the court would still hold that CARC is entitled to summary judgment. It is well-established that an employee may be terminated for "any reason, good or bad, or for no reason at all, as long as the employer's reason is not proscribed by Congressional statute." *Kahn v. U.S. Secretary of Labor,* 64 F.3d 271, 279 (7th Cir.1995). Title VII is one such proscriptive statute. It prohibits an employer from discharging an individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). While prohibiting certain types of discrimination, "Title VII does not prohibit unfairness or wrongheaded decisions in the workplace." *Johnson v. Hondo, Inc.,* 125 F.3d 408, 415 (7th Cir.1997).

A plaintiff bringing a retaliation action may establish the claim either through direct proof of discriminatory [or retaliatory] intent, or through the indirect, burden shifting method of proof first elaborated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Smith v. Cook County,* 74 F.3d 829, 831 (7th Cir.1996). In this case, Rudd lacks direct evidence and must proceed under the burden-shifting method of proof.

Under the familiar burden-shifting method, Rudd must first establish a *prima facie* case of retaliation. A *prima facie* case of retaliation is set forth when a plaintiff demonstrates that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there was a causal link between the protected expression and the adverse action." *Alexander v. Gerhardt Enterprises, Inc.,* 40 F.3d 187, 195 (7th Cir.1994). If established, the *prima facie* elements raise a rebuttable presumption of discrimination. *See Cianci v. Pettibone Corp.,* 152 F.3d 723, 726 (7th Cir. 1998); *EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149 (7th Cir. 1996). The burden of production, not proof, then shifts to the defendant for purposes of articulating a legitimate, nondiscriminatory reason for its action. *See Our Lady of Resurrection,* 77 F.3d at 149. "The defendant must produce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (citations omitted). If the defendant satisfies its burden of production, "the *McDonnell Douglas* evidence forcing schema

falls out of the case" and the plaintiff must present enough evidence showing a genuine issue of material fact "that the true reason was a discriminatory one, just as if there had never been *McDonnell Douglas.*" *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1399 (7th Cir.1997); *see also Oates v. Discovery Zone,* 116 F.3d 1161, 1170 (7th Cir.1997). In other words, at this point Rudd would have to present evidence showing that CARC's articulated reason for terminating her was phony, a mere pretext for discrimination. *See Cianci,* 152 F.3d at 726.

■ The court finds that Rudd has not established a *prima facie* case of retaliatory discharge. At first glance it is clear that the third element, the "causal link," is missing. In order to demonstrate the "causal link," Rudd must demonstrate that CARC would not have taken the adverse action "but for" the protected expression. *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995). Rudd may establish a causal link through evidence that the discharge took place "on the heels of the protected activity." *Alexander,* 40 F.3d at 196. In other words, "a telling temporal sequence can demonstrate this causal link." *Id.; see also Johnson v. Sullivan,* 945 F.2d 976, 980 (7th Cir.1991) (link established where one day passed between protected expression and adverse action); *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir.1989) (one week); *Farmer v. Continental Ins.,* 955 F.Supp. 970, 978 (N.D.Ill.1997) (two days). Here, such a temporal connection does not exist between the complaints of harassment (the protected activity) and the termination.

CARC terminated Rudd in June 1991, two and a half years after she accused Brandow of sexual harassment. Such a lengthy gap does not constitute a temporal link. *See Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998) (five month period between protected expression and adverse employment action does not suggest a causal link); *Hughes v. Derwinski,* 967 F.2d 1168, 1174–75 (7th Cir.1992) (four months); *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 321 (7th Cir.1992) (nearly six months); *Thomas v. Metra Rail Serv.,* 941 F.Supp. 758, 762 (N.D.Ill.1996) (three years). Thus, Rudd fails to establish a *prima facie* case.

■ Assuming Rudd could establish a *prima facie* case, she still could not survive summary judgment. CARC has articulated a legitimate, non-discriminatory reason for Rudd's termination. According to CARC, it could not continue to fund Rudd's program on its own budget and it could not, despite extended efforts, secure outside funding. Therefore, the program, and consequently Rudd's position, were terminated. Rudd presents no evidence to suggest that the decision was pretextual. Simply put, Rudd has failed in her burden of proof. Rudd makes no attempt to connect her conduct with CARC's alleged retaliation at all.

What the record shows is that Rudd was involved in numerous confrontations with CARC. CARC was concerned about her conduct as far back as 1982. Although the court discussed some of these instances (some taking place 17 years ago), they are largely irrelevant to Rudd's action, yet they are telling in demonstrating what can fairly be described as Rudd's attempted deception. Even accepting as true Rudd's allegations that Brandow made inappropriate gestures toward her, the record suggests an attempt by Rudd to trump up additional facts by pressuring her subordinates. These attempts followed numerous disciplinary actions taken by Brandow. But Rudd's deception did not end there. It continued with a lie either before the Social Security Administration or this court. In short, the record is replete with evidence of Rudd's attempts to deceive, but it is devoid of any facts from which a reasonable trier of fact could construct a bridge linking her allegations of misconduct to her termination.

Essentially, Rudd is asking the court to second guess a business decision. However, the court does "not sit as a super-personnel department that reexamines an entity's business decisions." *See Hiatt v. Rockwell Int'l Corp.,* 26 F.3d 761, 772 n. 13 (7th Cir.1994) (quotation marks and citations omitted). "Title VII prohibits discriminatory employment actions, not hasty or ill-considered ones." *See Morrow v. Wal–Mart Stores,*

*Inc.*, 152 F.3d 559, 564 (7th Cir.1998). Because Rudd cannot establish that CARC unlawfully retaliated against her, the court grants CARC's Motion for Summary Judgment.

### III. CONCLUSION

For the foregoing reasons, CARC's Motion for Summary Judgment is granted.

IT IS SO ORDERED.